## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| National Parks Conservation Association, | ) |
| Plaintiff, | ) |
| v. | ) |
| United States Forest Service, *et al.*, | ) |
| Defendants, | )   Civil No. 15-cv-01582 (APM) |
| and, | ) |
| Elkhorn Minerals LLC, | ) |
| Intervenor. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I.   INTRODUCTION

This case concerns gravel mining on 24.6 acres of land located in Billings County, North

Dakota.  On December 14, 2015, Intervenor Elkhorn Minerals LLC received final approval from

Defendant United States Forest Service to begin mining operations on a five-acre parcel of that

land.  The approved operations started the very next day and are ongoing.  Plaintiff National Parks

Conservation Association has moved this court for a preliminary injunction that, if granted, would

halt mining operations immediately.

The 24.6 acre tract has a storied history.  It was once part of Theodore Roosevelt's

expansive Elkhorn Ranch, which the former president purchased in 1884.  Today, it is adjacent to

the Elkhorn Ranch Unit of Theodore Roosevelt National Park, where President Roosevelt's ranch

house once stood.  Motivated by the area's historical significance, in 2007, the United States Forest

Service, with the assistance of private funds, acquired the 24.6 acres as part of a 5,200 acre purchase of land surrounding the Elkhorn Ranch Unit.  The Forest Service's purchase, however, was limited only to the land's surface rights.  The land's sub-surface rights remained under the control of various private parties.

Elkhorn Minerals holds sub-surface rights in the 24.6 acre parcel.  In 2010, its owners took initial steps to exercise those rights.  That began a nearly six-year process—involving extensive negotiations with the Forest Service, the preparation of an Environmental Assessment pursuant to the National Environmental Policy Act, and the issuance of a Decision Notice and Finding of No Significant Impact—that culminated in the start of mining operations on December 15, 2015.  Two days later, Plaintiff filed a Motion for Preliminary Injunction, alleging that the Forest Service's approval of mining operations violated the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act.

Injunctive relief is an extraordinary remedy.  To receive it, a moving party must show that, absent such relief, it will suffer irreparable harm.  It also must show that the balance of equities and the public interest favor a preliminary injunction.  Upon consideration of the parties' filings, the Administrative Record, and the parties' representations at oral argument, the court finds that Plaintiff has failed to make those required showings.  The court therefore denies Plaintiff's Motion for a Preliminary Injunction.

This Memorandum Opinion does not address Plaintiff's claims on the merits.  The court, however, will address those arguments on an expedited basis.  The Forest Service and Elkhorn Minerals have represented that mining operations on the first five-acre parcel are expected to continue through mid-March 2016.  To enable the court to reach a final decision on the merits

before then, the parties will be required to complete merits briefing on an expedited schedule. An Order setting forth a briefing schedule accompanies this Memorandum Opinion.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Purchase of the Elkhorn Ranchlands*

In 2007, Defendant United States Forest Service ("Forest Service") and "a group of more than 100 private individuals and organizations from around the United States" purchased the Elkhorn Ranchlands from a private landholder for 4.8 million dollars. Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 31-1 [hereinafter Pl.'s Mot.], at 4; *see also* Defs.' Opp'n to Mot. for Prelim. Inj., ECF No. 35 [hereinafter Defs.' Opp'n], at 6. The approximately 5,200-acre parcel lies within an area called the Dakota Prairie Grasslands and is under the domain of the Forest Service's Medora District Ranger. *See* Defs.' Opp'n at 6. The parcel "surround[s] the Elkhorn Ranch Unit of the [Theodore Roosevelt] National Park," Pl.'s Mot. at 4, which is one of three "main units of the Park," Intervenor's Mem. in Opp'n to Mot. for Prelim. Inj., ECF No. 36 [hereinafter Int.'s Opp'n], Decl. of David C. Fredley, ECF No. 36-3 [hereinafter Fredley Decl.], ¶ 9.

The Elkhorn Ranch Unit includes the site of Theodore Roosevelt's former home. *See* Pl.'s Mot. at 4. The historical significance of that site motivated the purchase of the Elkhorn Ranchlands. *See* FS-002296 ("Acquisition of this parcel will preserve the integrity and historic character of the area around the Theodore Roosevelt Elkhorn Ranch[.]"); *see also* Pl.'s Mot. at 4; Defs.' Opp'n at 6. It also motivated the 2012 designation of portions of the Elkhorn Ranchlands, along with the Elkhorn Ranch Unit and other historically significant lands, as the "Theodore Roosevelt's Elkhorn Ranch and Greater Elkhorn Ranchlands Historic District" (the "Elkhorn

Ranchlands NHD"). Pl.'s Mot., Ex. A, Environmental Assessment: Elkhorn Gravel Pit [hereinafter EA], at 29. The 24.6 acres that Elkhorn Minerals intends to mine (the "Gravel Pit") lie within both the Elkhorn Ranchlands and the Elkhorn Ranchlands NHD, approximately 0.8 miles from the Elkhorn Ranch Unit. EA at 31-32, 35, 48, 55-56.

The Forest Service's 2007 purchase of the Elkhorn Ranchlands was subject to all valid, existing mineral rights. *See* FS-003443-4 ("Reserving [u]nto the Grantor [a]ll metals, ores and minerals of any nature whatsoever in or upon the [Elkhorn Ranchlands] and including . . . gravel that may be owned together with the right to enter upon said lands for the purpose of [mining operations] and to occupy and make use of so much of the surface of said land as may be reasonably necessary[.]"); *see also* EA at 7 (quoting FS-003443-4); Defs.' Opp'n, Second Decl. of Shannon Boehm, ECF No. 35-1 [hereinafter Sec. Boehm Decl.], ¶ 3 ("All transaction documents made clear that surface and subsurface minerals were not included in the acquisition of Elkhorn Ranchlands."). In other words, while the Forest Service acquired the surface rights to the Elkhorn Ranchlands, the tract's sub-surface rights remained in private hands. Indeed, the Elkhorn Ranchlands has "approximately forty different third party surface mineral and/or subsurface mineral owners," whose rights "were not available for purchase by the government" in 2007. EA at 6. Peggy Braunberger, one of Elkhorn Minerals' owners, *id.* at 9, purchased "26.86% [of the] mineral ownership from [a] third party in 2009," *id.* at 6.

### 2.    *Development of the Gravel Pit and Compliance with NEPA*

#### i.    Initial steps

On February 9, 2010, Braunberger submitted to the Medora District Ranger the "initial Operating Plan to mine and develop the" Gravel Pit. *Id.* at 4.[1] This Operating Plan, however, was

---

[1] The Environmental Assessment also indicates that Ms. Braunberger submitted an "application for [broader] gravel exploration and development on October 8, 2008." EA at 4. This assertion contradicts the Environmental

"too generic and did not address all resource, surface use, and operation concerns." *Id.* On September 1, 2011, after "approximately eighteen months of negotiations" with the Forest Service, Braunberger submitted her final Operating Plan. *Id.* at 4, 19; *see also* Defs.' Opp'n at 8. The Forest Service, through the Medora District Ranger, then issued a "Public Scoping Letter" to "one hundred contacts, including county commissioners, state, and federal agencies, tribal governments, environmental groups, private interested individuals, and the press," Defs.' Opp'n at 8, soliciting comments on the Operating Plan, *see* FS-000625-27. It received 71 comments in response. *See* FS-000628-740; *see also* Defs.' Opp'n at 8.

### ii.   Preparation of the Environmental Assessment and Issuance of the Decision Notice and Finding of No Significant Impact

The National Environmental Policy Act ("NEPA") requires federal agencies to issue an exhaustive, in-depth analysis document referred to as an "Environmental Impact Statement" ("EIS") in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA, however, permits agencies as a first step to prepare an Environmental Assessment ("EA")—a comprehensive but less-detailed analysis of a proposed project's environmental impact—to determine whether an EIS is necessary. *See* 40 C.F.R. §§ 1501.3-4. If, based on a completed EA, an agency determines that a proposal will *not* significantly affect the quality of the environment, it may issue a Decision Notice and Finding of No Significant Impact ("DN/FONSI") instead of proceeding with an EIS. *Id.* § 1501.4(e)(1). A DN/FONSI includes the EA or a summary of it and "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." *Id.* § 1508.13.

---

Assessment's later statement that Ms. Braunberger purchased her mineral rights in 2009. *Id.* at 6. Because the Forest Service's decision at issue in this case is unrelated to any October 8, 2008 (or, perhaps, October 8, 2009) application, this discrepancy has no bearing on the court's analysis.

As relevant to this case, the public-facing NEPA process began in May 2012, approximately eight months after Braunberger had submitted the Gravel Pit's final Operating Plan. On May 11, 2012, the Forest Service issued a second Public Scoping Letter, this time soliciting comments on a draft EA it had prepared for the Gravel Pit. *See* FS-000958-59; FS-000081-151. The Forest Service received 54 comments on its draft EA. *See* FS-000974-1086; *see also* Defs.' Opp'n at 9. Instead of modifying the draft based on these comments, the Forest Service entered into an agreement with Braunberger and Roger Lothspeich—a current co-owner of Elkhorn Minerals to whom Braunberger had granted Power of Attorney, *see* EA at 20—"to put processing of the Operating Plan on hold to search for possible exchange properties and to explore alternatives to development of the [Gravel Pit]," Defs.' Opp'n at 9; *see also* FS-003914-15.

This "Agreement in Principal" was in effect from July 18, 2012, to August 2, 2013, at which point Braunberger and Lothspeich withdrew. *See* EA at 20-21; Defs.' Opp'n at 9. In a letter to the Forest Service, counsel for Braunberger and Lothspeich explained that his clients "remain open to considering alternative resolutions," but chose to withdraw "because of the lack of progress that has occurred over the past year in pursuing the mineral exchange option, and because of various acknowledged feasibility problems which have arisen[,] raising questions about whether it is realistic to hope to achieve the mineral exchange as a solution." FS-003916. In that same letter, counsel "request[ed] that the Forest Service . . . bring the Operating Plan review process to a favorable conclusion expeditiously." FS-003917. Three months later, on November 15, 2013, Braunberger and Lothspeich "transferred [their mineral rights] by Quit Claim to Elkhorn Minerals." EA at 9.

The Forest Service thereafter "incorporate[d] changes resulting from public and agency input" into the draft EA and, on April 21, 2014, issued an updated EA. Defs.' Opp'n at 9. Three

days later, on April 24, 2014, the Forest Service issued a draft DN/FONSI, which it then subjected to a "pre-decisional objection period." Defs.' Opp'n at 10. Following the close of the objection period, the Forest Service made alterations to both the updated EA and the draft DN/FONSI. *Id.*

### iii. Content of the Environmental Assessment and the Decision Notice and Finding of No Significant Impact

On January 6, 2015, the Forest Service issued the final versions of the EA and the DN/FONSI for the Gravel Pit. *Id.* The final EA is an 80-page document that analyzes the proposed Gravel Pit, the Operating Plan, and their environmental effects. *See generally* EA. It contains background on the Gravel Pit's development and discusses, among other issues, its "purpose and need"; the private rights involved; applicable rules and regulations; alternative projects considered; mitigation measures to be implemented; and direct, indirect, and cumulative environmental impacts. *Id.* The 19-page DN/FONSI summarizes and at times quotes directly from the EA. *See* FS-000576-95 [hereinafter DN/FONSI]. It finds that the Gravel Pit "will not significantly affect the quality of the human environment" and that the project's impacts "are not significant." *Id.* at 15. Accordingly, the DN/FONSI concludes that "the preparation of an [EIS] is not needed." *Id.*

Notwithstanding that conclusion, the Forest Service, in both the DN/FONSI and the EA, acknowledged that the project may, and in some cases will, have "adverse effects." *See, e.g.*, DN/FONSI at 16 ("The project may have an 'adverse effect' on the overall integrity of the Elkhorn Ranch."); EA at 47 ("[M]itigation measures will reduce but not eliminate the impacts.").

First, the Forest Service acknowledged that the mining operations may have temporary and intermittent adverse impacts on the visitor experience at and around the Elkhorn Ranch Unit. *See* EA at 37 ("The Elkhorn Ranchlands NHD experience may be negatively affected during the normal mining operating season from April through November for approximately two [to] three

years."). "Specifically," the EA stated, "the gravel pit operation may have visual (pit, machinery), audible (equipment and vehicle noise), and atmospheric (dust, equipment and vehicle fumes) effects that will diminish the property's historical integrity." *Id.* at 38; *see also id.* at 41 ("[N]oise from the mining proposal . . . would clearly be noticeable from within the park, adjacent state lands, and from the residential area during daily operations."); *id.* at 53 ("Mining operations would be visible from the higher elevation portions of the park . . . [and] Park visitors would see the heavy equipment used to remove the gravel."); *id* at 37 ("Dust may be visible during mining, loading of trucks and hauling."). The Forest Service found that mitigation measures "will reduce, though not eliminate, the[se] adverse effects." *Id.* at 39. It nevertheless concluded that, because the effects are "temporal and mitigatable," they "are not significant." DN/FONSI at 15.

Second, the Forest Service acknowledged that the Gravel Pit will have one *permanent* adverse impact: "an average elevation drop of eight feet within the pit area." EA at 37, 50, 52. According to the final EA, this "subtle permanent fingerprint on the landscape . . . may detract from the overall integrity of the Elkhorn Ranchlands NHD." *Id.* at 39. Nevertheless, the Forest Service concluded that this adverse effect was not significant because Elkhorn Minerals would be required to undertake extensive reclamation efforts after finishing each phase of mining. "[R]eclamation will ensure a natural form, line, color, texture and pattern common to the natural landscape," *id.* at 37, "will reestablish the natural rolling hills and remove the filled in low spots [previously created by decades of mining and other activities on the land,] and [will] eliminate the current altered landscape appearance," *id.* at 38; *see also* DN/FONSI at 8-9. In fact, the Forest Service determined that these particular mitigation measures "will have a positive effect on the current conditions." EA at 39. It conceded, however, that it "may take decades to reclaim the overall landscape of the entire . . . area." *Id.* at 37.

iv.   <u>Mining and associated operations</u>

Although the Forest Service had issued the final EA and the DN/FONSI in January 2015, Elkhorn Minerals still had to obtain additional agency approvals before mining operations could begin.  On May 29, 2015, the Forest Service issued permits allowing Elkhorn Minerals to use certain access roads.  *See* FS-004728-35; FS-004842-53.  On that same date, the Forest Service also issued a "Surface Occupancy Permit," which authorized Elkhorn Minerals to make use of the land's surface for mining activities through April 1, 2017.  *See* FS-004617-26.  With these permits having issued, from November 11, 2015, to December 14, 2015, Billings County—who Elkhorn Minerals contracted to perform road work and mining operations—improved the Gravel Pit's access roads.  *See* Sec. Boehm Decl. ¶¶ 4-7.

On December 14, 2015, after inspecting the road work and other "pre-work" that Elkhorn Minerals and Billings County had performed, the Forest Service issued a "Notice to Proceed" with "Phase 2," "the first of 4 mining phases . . . each [of which] involve an approximately 5-acre sub-site of the overall 24.6-acre authorization."  *Id.* ¶¶ 7-8.  Each of these four phases will involve the removal of topsoil, the extraction of gravel, and then the reclamation of a five-acre parcel.  *Id.* ¶ 9.  The reclamation process, which will begin as soon as the five-acres have been "completely mined," EA at 45, will include "replacement of overburden, re-contouring, . . . replacement of topsoil, and undertaking erosion measures," Sec. Boehm Decl. ¶ 9; *see also* EA at 25-26.  And before Elkhorn Minerals can start mining the next 5-acre parcel—that is, before it can move on to the next "phase"—it must obtain an approval from the Forest Service.  The Forest Service must conduct "a field-check" and then, before mining may commence, issue a "Notice to Proceed." Sec. Boehm Decl. ¶ 10; EA at 44.

Each five-acre phase is expected to take approximately two months, subject to weather conditions. *See* Tele. Conf. Tr., Dec. 18, 2015 (draft), at 7:23-8:1 ("It's [the Forest Service's] understanding at this stage, given the amount of gravel that's found, [that it] will take approximately two months to complete, but it could take longer if weather . . . conditions delay the operation."); *id.* at 9:21-23 (Elkhorn Minerals' counsel stated that "it will take at least two months to get through this current phase of disturbance of up to five acres"); Int.'s Mot., Second Decl. of Jeff Iverson, ECF No. 36-2, ¶ 4 ("It will take at least two to three months to carry out the planned gravel extraction and reclamation activities in the five-acre area that we are currently operating within."). At oral argument, Elkhorn Minerals represented that the current phase of mining will end, and the next will begin, "[m]ost likely . . . sometime after March 2015." Mot. Hr'g Tr., Jan. 8, 2016, ECF No. 41 [hereinafter Mot. Hr'g], at 68:14-15. Elkhorn Minerals added that current mining operations "could well extend out beyond March as the weather has been mild, but if the heavy winter in North Dakota sets in, that period could be longer." *Id.* at 68:15-17; *see also id.* at 90:9-10 (Plaintiff's counsel stating that "[t]he gravel pit miner is moving forward with phase two, which is now toward about March"). Thus, as of this date, the court understands that mining has occurred on no more than five acres of the 24.6 acre parcel.

### B.    Procedural History

Plaintiff National Parks Conservation Association ("NPCA") is a "nonpartisan non-profit organization headquartered in Washington, D.C. whose mission is to provide an independent voice for protecting and enhancing America's National Park System for present and future generations." Compl., ECF No. 1, ¶ 34. Its 360,000 members "use, enjoy and work to conserve [the] National Park System, including Theodore Roosevelt National Park." *Id.* As pertinent here, NPCA alleges

that its members use and enjoy the Elkhorn Ranch Unit of Theodore Roosevelt National Park, as well as other areas surrounding the Gravel Pit.  *Id.* ¶¶ 35-36.

Plaintiff filed its Complaint on September 29, 2015—eight months after the Forest Service issued the final EA and DN/FONSI for the Gravel Pit and four months after it issued the road permits and Surface Occupancy Permit, but before road improvements began.  *See generally* Compl.   In its Complaint, Plaintiff alleged that the Forest Service and five individuals in their official capacities[2] violated NEPA, 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See id.* ¶¶ 1, 38-46.  Specifically, NPCA claimed that Defendants acted arbitrarily and capriciously in connection with the Gravel Pit by (1) filing a deficient Environmental Assessment, or EA; (2) approving a Decision Notice and Finding of No Significant Impact, or DN/FONSI; and (3) failing to prepare an Environmental Impact Statement, or EIS.  *Id.* ¶¶ 1-2, 23-25.  Plaintiff further alleged that Defendants' failure to update the Dakota Prairie Grasslands' Land and Resource Management Plan prior to their issuance of the DN/FONSI was unlawful.  *Id.* ¶ 26.

On October 14, 2015, Elkhorn Minerals, as the owner of "the dominant mineral rights at issue in this case," filed a Motion to Intervene.  *See generally* Mot. to Intervene, ECF No. 4.  On November 9, 2015, in response to Plaintiff's Complaint, Defendants filed a Motion to Transfer the case to the District of North Dakota.  *See generally* Defs.' Mot. to Transfer Venue, ECF No. 15.

On November 30, 2015, before the court had ruled on those pending motions, Plaintiff filed a Motion for a Temporary Restraining Order ("Motion for TRO") based on its understanding that mining operations soon would commence.  The Motion for TRO asked the court "to suspend the

---

[2] The individual Defendants are:  Secretary of the United States Department of Agriculture Tom Vilsack; Chief of the Forest Service Tom Tidwell; Regional Forester for the Northern Region of the Forest Service Leanne Marten; Forest/Grasslands Supervisor for the Dakota Prairie Grasslands Dennis Neitzke; and District Ranger for the Medora Ranger District of the Dakota Prairie Grasslands Shannon Boehm.  *See* Compl. ¶¶ 42-46.

January 6, 2015 [DN]/[FONSI] and related permits authorizing construction of [the Gravel Pit] and associated roads that would be seen and heard from the . . . National Park and its historic Elkhorn Ranch." Mot. for TRO, ECF No. 20, at 1. On December 8, 2015, the court denied that Motion because "Plaintiff . . . made an insufficient showing as to both likelihood of success on the merits *and* irreparable harm." Memo. Opinion & Order, ECF No. 29, at 4.

On December 16, 2015—the day after mining operations started—Plaintiff filed its Motion for Preliminary Injunction. *See generally* Pl.'s Mot. for Prelim. Inj., ECF No. 31. Two days later, on December 18, 2015, the court held a telephone conference with the parties during which it orally denied Defendants' Motion to Transfer and set an expedited briefing schedule. *See* Dkt. Entry (Dec. 18, 2015).

The court held a hearing on the Motion for Preliminary Injunction on January 8, 2016. *See* Dkt. Entry (Jan. 8, 2016). At the start of the hearing, the court orally granted Elkhorn Mineral's Motion to Intervene. *See* Hr'g. Tr. 3:16-20. The court also inquired whether the parties would consent to consolidate the motion for preliminary relief with the "trial"[3] on the merits, as permitted under Federal Rule of Civil Procedure 65(a)(2). *See id.* at 4:16-5:6. The parties declined to do so. *See id.* at 5:13-6:12, 7:13-9:25, 10:10-21. Thus, the only ripe matter before the court is Plaintiff's Motion for Preliminary Injunction.

## III.   DISCUSSION

### A.   The Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations and internal

---

[3] As this case seeks review of an administrative decision under the APA, there will be no "trial." The merits will be evaluated based on the administrative record and any additional evidence that the court may allow. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (stating that under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

quotation marks omitted).   A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief."   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Specifically, a plaintiff must show:   (1) that it "is likely to succeed on the merits"; (2) that it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [its] favor"; (4) "that an injunction is in the public interest."   *Winter*, 555 U.S. at 20 (citations omitted).

Courts in this Circuit traditionally have evaluated these four factors on a "sliding scale"— if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."   *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).   The Supreme Court's decision in *Winter*, however, called that approach into doubt and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors have been convincingly established.   *Compare Davis v. Billington*, 76 F. Supp. 3d 59, 63 n.5 (D.D.C. 2014) ("[B]ecause it remains the law of this Circuit, the Court must employ the sliding-scale analysis here."), *with ABA, Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 165 (D.D.C. 2014) ("The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors." (citing *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring))).

Regardless of whether the sliding scale framework applies, it remains clear that a movant must demonstrate irreparable harm, which has "always" been "[t]he basis of injunctive relief in the federal courts."   *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v.*

*Westover*, 359 U.S. 500, 506-07 (1959)).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Indeed, if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors.  *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("Because [the plaintiff] has made no showing of irreparable injury here . . . [w]e . . . need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction."); *see also Econ. Research Servs., Inc. v. Resolution Econ., LLC*, No. 15-cv-1282, 2015 WL 6406390, at *3 (D.D.C. Oct. 21, 2015) ("Given that [the plaintiff] has not demonstrated 'irreparable harm,' the Court's inquiry begins, and ends, with this factor alone.").

Here, as discussed below, the court finds that Plaintiff has failed to show that it is likely to suffer irreparable harm absent preliminary relief.  Though that failure alone requires the court to deny Plaintiff's Motion, the court also finds that neither the balance of equities nor the public interest favors granting injunctive relief.  The court need not and does not reach today the Plaintiff's likelihood of success on the merits.  Whether Plaintiff can prevail on the merits, and obtain permanent injunctive relief, is a question for another day.

### B.    Irreparable Harm

The Court of Appeals "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel*, 454 F.3d at 297; *see also Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 113 (D.D.C. 2015) ("The standard for irreparable harm is particularly high in the D.C. Circuit."); *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) ("The irreparable injury requirement erects a very high bar for a movant.").  The

injury claimed "must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Critical to establishing "certain" and "actual" harm is a demonstration of imminence—"[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (citation omitted). Further, the alleged "injury must be beyond remediation." *Chaplaincy of Full Gospel*, 454 F.3d at 297.

The movant bears the burden of substantiating, with evidence, that the injury is certain, imminent, great, and beyond remediation. *Wisc. Gas Co.*, 758 F.2d at 674. "Bare allegations of what is *likely* to occur are of no value since the court must decide whether the harm will *in fact* occur." *Id.* (first emphasis added). Thus, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.*; *see also United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154, 161 (D.D.C. 2013). This court's Local Rules underscore the need for the movant to present such proof, requiring that "[a]n application for a preliminary injunction . . . be supported by all affidavits on which the plaintiff intends to rely" and prohibiting the filing of "[s]upplemental affidavits" without "permission of the Court." Local Civ. R. 65.1(c).

Environmental groups, like Plaintiff, can establish standing to bring suit at the pleadings stage by alleging injury to their "members' use and enjoyment" of a particular area, such as a national park. *See, e.g.*, *Wilderness Soc'y v. Norton*, 434 F.3d 584, 594 (D.C. Cir. 2006). But such injury, though necessary, is not sufficient to show *irreparable* harm. For one, under the preliminary injunction standard, the harm to the members' use and enjoyment of a particular area must be certain, imminent, great, and beyond remediation. *See Wisc. Gas Co.*, 758 F.2d at 674; *see also Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995) (finding that the

plaintiff "adequately pled facts supporting its standing to bring suit" before noting that "to establish the grounds for a preliminary injunction [the plaintiff] must show more," including "demonstrat[ing] . . . an irreparable injury that the proposed injunction would avert"); *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (Rogers, J., dissenting) ("[T]o show irreparable harm '[a] plaintiff must do more than merely allege . . . harm sufficient to establish standing.'" (citation omitted)). Additionally, the injunction standard demands actual *proof* of injury, as opposed to the mere allegation of an injury sufficient to establish standing at the pleadings stage.

Here, Plaintiff contends that, absent injunctive relief, it likely will suffer irreparable harm because its "members frequently visit, use and enjoy national parks, including Theodore Roosevelt National Park," and the Gravel Pit "will irreparably damage the Elkhorn Ranchlands and the scenic landscape, quiet solitude and historic values of the . . . Park, which Plaintiff NPCA and its members work to protect." Pl.'s Mot. at 28. Plaintiff alleges that it will suffer irreparable injury as a result of the Gravel Pit's temporary and permanent adverse effects. It also claims that Defendants' violation of NEPA caused it to incur a procedural injury, which supports a finding of irreparable harm. The court finds that none of these asserted injuries satisfies the demanding requirements of the irreparable harm standard.

> 1. *Audible, Visual, and Atmospheric Adverse Effects During Mining Operations*

Plaintiff first asserts that irreparable harm will arise from "the sound, visual, and other impacts of the gravel mining construction and operation[.]" Pl.'s Reply in Supp. of Mot. for Prelim. Inj., ECF No. 39 [hereinafter Pl.'s Reply], at 20; *see also id.* at 22 ("[T]he gravel mining construction and operation . . . is causing and will continue to cause irreparable harm[.]"). That harm is not at all speculative. Indeed, the EA and DN/FONSI make clear that during mining

operations, visitors to the areas surrounding the Gravel Pit, including the Elkhorn Ranch Unit, may experience adverse visual, audible, and atmospheric effects.  *See, e.g.*, EA at 38.

Plaintiff, however, has failed to show that these adverse effects are of "such *imminence*" to its members "that there is a 'clear and present' need for equitable relief."  *Wisc. Gas Co.*, 758 F.2d at 674 (citation omitted).  As the cases on which Plaintiff relies demonstrate, a finding of imminent harm requires at least *some* evidence that a member of an association—or a co-plaintiff in the suit—will soon be in the area where the adverse effects will occur.  *See Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 214, 214 n.1 (D.D.C. 2003) (finding irreparable harm where two plaintiffs could view and hear the animals allegedly threatened by the challenged government action from their home, and noting that the claims of two other plaintiffs who did "not allege that they live in or travel to the [area] . . . are not relevant to the motion presently before the Court"); *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 144, 151 (D.D.C. 1993) ("Plaintiffs are the Fund for Animals, Inc. . . . and four individuals who reside near Yellowstone National Park . . . and frequent it."); *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009) (finding irreparable harm where environmental organization provided "[e]vidence . . . from several members . . ., all of whom live in close proximity to the Refuge and have interests in the [area]").  That requirement is logical.  After all, when an association's asserted injury rests on disruption of the visitor experience, such injury cannot be imminent unless at least one of the association's members intends to visit the location in the near future—here, in the next several months, before the court resolves this case—and thereby experience the environmental consequences of the challenged action—here, adverse audible, visual, and atmospheric effects.

Plaintiffs have submitted five affidavits to demonstrate irreparable harm.  But not one of them establishes that the affiant will imminently experience the adverse environmental effects

stemming from the mining operations.  Affiant Tweed Roosevelt, who is the grand-grandson of Theodore Roosevelt, does not claim to be a member of NPCA.  But even if he were a member, he does not say anything about when he intends to visit the Elkhorn Ranchlands or Theodore Roosevelt National Park.  *See generally* Pl.'s Mot., Ex. J, Decl. of Tweed Roosevelt, ECF No. 31-11.  Another affiant says that Roosevelt "enjoys his annual fall visit" to the area, *see id.*, Ex. L, Decl. of James Fuglie, ECF No. 31-13 [hereinafter Fuglie Decl.], ¶ 23, but that statement, like those of Roosevelt, does not demonstrate that Roosevelt will imminently be harmed by the Gravel Pit's adverse effects.

Affiant Bart Melton, who is the Regional Director of NPCA's Northern Rockies Regional Office, makes no assertion about any past or intended future visit to the area by him.  *See generally id.*, Ex. S, Decl. of Bart Melton, ECF No. 31-20.  And Greg A. Vital, who serves on NPCA's Board of Directors, says only that he "first visited the Elkhorn Ranch Unit . . . in June 2015" and that he "would love to return."  *Id.*, Ex. N, Decl. of Greg A. Vital, ECF No. 31-15, ¶¶ 6, 9.  At most, Vital has expressed a "vague desire" to return to the area.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  In *Summers*, the Supreme Court held that a "vague desire to return is insufficient to satisfy the requirement of imminent injury" for purposes of establishing standing.  *Id.*  If such a vague desire is insufficient to establish standing, it certainly does not establish irreparable harm.  *See Taylor*, 56 F.3d at 1508; *In re Navy Chaplaincy*, 534 F.3d at 766.

A fourth affiant, Timothy R. Stevens, a current member of NPCA, states that he has "visited Theodore Roosevelt National Park over five times"; that he "frequently stops at Park overlooks when . . . driving nearby in order to experience the Park"; that he has "visited the Elkhorn Ranch Unit . . . and the Greater Elkhorn Ranchlands two to three times"; that he "last visited the Elkhorn Ranch Unit of Theodore Roosevelt National Park in September or October of 2014"; and that he

"intends to return to the Elkhorn Ranch Unit within the next year or two," but "will not go back .
. . if the proposed gravel pit is allowed to move forward." Pl.'s Mot, Ex. M, Decl. of Timothy R.
Stevens, ECF No. 31-14, ¶¶ 5-6, 18. Again, like Vital, Stevens has expressed, at most, a "vague
desire to return," which is not enough to prove irreparable harm. If anything, Stevens has said that
he will *not* return because mining operations have moved forward.

A final affidavit—that of NPCA member James C. Fuglie—merits a harder look. Fuglie
attests that he "visits the Elkhorn Ranch Unit of Theodore Roosevelt National Park and the
ranchlands surrounding the Park . . . at least a half-dozen times each year"; "last visited . . . on
October 15, 2015"; "visited . . . almost every week during the summer of 2015, and plan[s] to
continue to do so"; visited with his wife "on a crisp January day many years ago . . . and [they]
return each year"; and visited on August 28, 2015. Fuglie Decl. ¶¶ 9-11, 23. Although Fugile
attests to numerous, consistent visits to the area, he does not say that he intends to visit in the
coming months. Plaintiff asks the court to interpret Fuglie's statement that he and his wife "came
to the Elkhorn Ranch . . . on a crisp January day many years ago. . . and return each year," to mean
that the affiant and his wife return *every January*. *See* Hr'g Tr. 90:15-17 ("We have Mr. [Fuglie]'s
affidavit that says he and his wife had a special moment at Elkhorn Ranch one January. They
come to Elkhorn Ranch every January."). But a straightforward reading of the affidavit does not
support that interpretation. While Fuglie states that he and his wife return each year, he does not
specify when those visits take place. Given that the bar for irreparable injury is "very high" and
that Plaintiff bears the burden for establishing such injury with actual proof, the court will not
make the assumption Plaintiff urges.

Furthermore, other record evidence supports the absence of irreparable injury. Valerie
Naylor, a United States Park Service employee who is the Superintendent of Theodore Roosevelt

National Park, wrote in a letter to the Forest Service that Elkhorn Ranch receives 99 percent of its visitors from April to November.  *See id.*, Ex. Q, Letter to Medora District Ranger (June 11, 2012), ECF No. 31-18, at 2.  The record also contains a statement, albeit hearsay, from an employee of one the Park's Visitor Centers that the Elkhorn Ranch Unit receives "maybe 1,000 [visitors] per year," Fredley Decl. ¶ 9; *see also* Int.'s Opp'n at 28-29.  Plaintiff has not offered any evidence indicating otherwise.  Thus, it appears that few people visit the area near the Gravel Pit from January to March.

In short, based on the record evidence, the court cannot conclude that any of Plaintiff's members will be in the vicinity of the Gravel Pit in the coming months and thus be imminently harmed by the visual, audible, and atmospheric effects of mining operations.

### 2.    *Permanent Effect*

Plaintiff also claims that the permanent adverse effect of the Gravel Pit—namely, an eight-foot drop in elevation of the mined land—constitutes irreparable harm to its members.  *See* Pl.'s Reply at 21-22 ("Th[e] long time to reclaim the overall landscape suffices to establish irreparable harm.").  The court takes seriously any permanent alteration to the natural environment.  But the permanent injury to the land at issue in this case does not rise to the level of "great" that the irreparable harm standard requires.  *Cf. Fund For Animals v. Norton*, 281 F. Supp. at 220 (finding irreparable harm where the granting of permits would result in the killing of 525 of the 3,600 mute swans in a particular area); *Fund for Animals, Inc. v. Espy*, 814 F. Supp. at 143, 151 (finding irreparable harm where agency decision would result in "the capture . . . of 10 to 60 pregnant wild bison . . . their transportation by truck 2000 miles . . . their artificial infection with [a] microorganism . . . and, after a few months of study, their slaughter."); *San Luis Valley*, 657 F. Supp. 2d at 1241 (finding irreparable harm where the drilling of an oil well threatened one of two

habitats of an "extremely sensitive" and endangered species and posed risk to an "aquifer that [was] critical in supplying water to the area").

Here, Elkhorn Minerals presently is mining on five acres of land—less than .001 percent of the 5,200-acre Elkhorn Ranchlands that surrounds the Elkhorn Ranch Unit.  Though the mining operations will cause a permanent eight-foot drop to the mined land, that harm is mitigated by the requirement that Elkhorn Minerals start to perform land reclamation measures immediately upon the completion of mining on each 5-acre parcel.  Those reclamation measures "will reestablish the natural rolling hills and remove the filled in low spots," thereby "eliminat[ing] the current altered landscape." EA at 53.  They will also "reestablish the natural vegetative colors and textures of the land" through the planting of "native seed mixtures." *Id.*  Although these environmental improvements will not come to fruition immediately, and will not fully mitigate the loss of the eight feet of soil, they do diminish the harm of which Plaintiff complains.  *See Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (considering "extensive mitigation plans" in determining that the plaintiffs would not suffer great harm in the absence of injunctive relief).  The court therefore finds that the permanent eight-foot drop of the presently mined five-acre parcel, when combined with required mitigation measures, is not sufficiently "great" to permit the court to grant the extraordinary relief requested.[4]

### 3. Procedural Harm

Plaintiff also invites the court to "consider the procedural harm to Plaintiff from uninformed environmental decisionmaking in assessing irreparable harm." Pl.'s Mot. at 30.  In *Summers*, the Supreme Court concluded that "deprivation of a procedural right without some

---

[4] As indicated, the court will endeavor to reach a decision on the merits of this case before the next phase of mining operations begins.  However, should additional mining commence on the next five-acre phase before a final decision, that fact alone would not convince the court that Plaintiff has suffered irreparable harm.  The permanent loss of elevation on an additional .001 percent of the Elkhorn Ranchlands, when offset by mitigation measures, would not be so great as to warrant preliminary injunctive relief.

concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." 555 U.S. at 496. The same is true for demonstrating irreparable harm. As stated in *Fund For Animals v. Norton*, "procedural harm arising from a NEPA violation is insufficient, *standing alone*, to constitute irreparable harm justifying issuance of a preliminary injunction." 281 F. Supp. 2d at 222; *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 544-45 (1987) (finding that a lower court's presumption of irreparable harm "when an agency fail[ed] to evaluate thoroughly the environmental impact of a proposed action . . . [was] contrary to traditional equitable principles" (quoting *People of Village of Gambell v. Hodel*, 774 F.2d 1414, 1423 (9th Cir. 1985) (citation and internal quotation marks omitted))).

The court has weighed the potential procedural harm of a NEPA violation. But even assuming that Defendants did violate NEPA here, that procedural harm would largely "stand alone"—the only identified immediate concrete injury being the permanent loss of some soil, which the court has concluded does not constitute "great" injury. Accordingly, Plaintiff's claimed procedural harm does not add sufficient weight to establish irreparable harm.

## C. Balance of Equities

The court now turns to the balance of equities. In assessing this factor, courts generally consider whether the requested injunctive relief would "substantially injure other interested parties." *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009). Here, that analysis involves a consideration of the effect of an injunction on Plaintiff, Defendants, and Intervenor Elkhorn Minerals. The court has discussed above the injury that will befall Plaintiff in the absence of immediate injunctive relief, concluding that it does not rise to the level of irreparable harm. Defendants, for their part, do not allege that they will suffer harm if the requested relief is granted. *See* Defs.' Opp'n at 34-35; *see also* Pl.'s Reply at 22 ("Defendants do not allege

that they will be harmed if the preliminary injunction is granted . . . and thus waive that argument."). Elkhorn Minerals, however, asserts that as "a direct target of the NPCA's preliminary injunction motion [it] certainly stands to be harmed by an injunction." Int.'s Opp'n at 29. The company argues that "after years of planning, governmental scrutiny, and negotiations with other stakeholders, [it] – as the owner of the dominant mineral estate – should at long last be allowed to proceed with the development of its minerals as a matter of fundamental fairness." *Id.*

The court finds that Elkhorn Minerals would suffer harm if a preliminary injunction were granted. Nearly six years of negotiations with the Forest Service preceded the start of operations at the Gravel Pit. According to the EA, Elkhorn Minerals "agreed to every negotiated mitigation measure with the exception of [two]." EA at 22. The DN/FONSI further notes that Elkhorn Minerals "has been exceedingly cooperative in identifying and agreeing to all reasonable stipulations." DN/FONSI at 15. And the Administrative Record makes clear that Elkhorn Minerals undertook substantial efforts to explore alternatives to the project that was ultimately approved. *See, e.g.*, FS-003916. Elkhorn Minerals and its contractor, Billings County, have incurred substantial expenses preparing for and commencing mining operations. *See* Int.'s Opp'n at 21. The company undoubtedly would be prejudiced if the court issued an injunction that halted operations.

An additional fact weighs against Plaintiff in the balance of equities: Plaintiff's request for an injunction could have been avoided had Plaintiff filed its suit earlier in time. Plaintiff filed its Complaint on September 29, 2015. *See generally* Compl. However, the final EA and DN/FONSI were issued on January 6, 2015, and Plaintiff could have filed suit immediately thereafter to challenge the final agency action that it now argues is unlawful. *See* 5 U.S.C. § 704. Had Plaintiff filed this lawsuit in, for example, February 2015, the court likely would have resolved the dispute

before the commencement of road work or mining activities, thereby obviating the need for the extraordinary relief requested. Plaintiff's delay in filing this lawsuit therefore weighs against it in the court's balance of equities. When combined with the harm to Intervenor Elkhorn Minerals, the court finds that Plaintiff has failed to make a positive showing on this third preliminary injunction factor. Indeed, the balance of equities weighs against granting a preliminary injunction.

### D. The Public Interest

Finally, the court finds that Plaintiff has failed to make a positive showing that the public interest favors an injunction. Plaintiff argues that the public interest is served by an agency's compliance with NEPA. *See* Pl.'s Mot. at 32. The court agrees. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 26 (D.D.C. 2009) ("There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely."). But ensuring compliance with NEPA—even if the court were to determine that a NEPA violation occurred—is not the only public interest at stake. As Defendants and Elkhorn Minerals note, "[t]here is high demand for gravel and scoria in Billings County and western North Dakota" and the "Gravel Pit will provide an additional source of gravel to serve this need." Defs.' Mot. at 39-40; *see also* Int.'s Mot. at 31 ("[A]s of December 2015, there was an immediate need for the gravel from the . . . Gravel Pit to be applied to road surfacing over an approximately three-mile area of Mike's Creek Road, which is several miles away from the . . . site."). The interests of the traveling public in Billings County will be served by the extraction of gravel from the Gravel Pit.

Additionally, the relief Plaintiff seeks—an immediate halt to mining operations—may result in otherwise avoidable damage to the very land Plaintiff aims to protect. Medora District Ranger Shannon Boehm has stated that "[s]ince mining has begun on Phase 2 it is critical to

complete this entire phase through reclamation." Sec. Boehm Decl. ¶ 20. "Leaving [topsoil and overburden] stockpiles in place during late winter snowfalls and spring precipitation will result in . . . the likely loss of material . . . that is essential to reclaim the site." *Id.* ¶ 21. At oral argument, Plaintiff acknowledged this issue and agreed to work with the parties involved to solve it should the court grant its requested relief. *See* Hr'g Tr. 36:18-37:16. Although the court does not doubt the sincerity of Plaintiff's representations, given the modest size of the acreage of the present mining operations, the court finds that the public interest is better served by completion of that phase of mining operations, including planned land remediation measures.

Although Plaintiff has shown that the public interest, in part, favors granting a preliminary injunction, others factors favor allowing the presently approved mining operations to continue. Thus, this fourth factor is, for Plaintiff, neutral at best. Plaintiff therefore has failed to make a positive showing that the public interest favors injunctive relief.

## IV.    CONCLUSION AND ORDER

As Plaintiff has failed to carry its burden of demonstrating irreparable harm and has failed to show that the balance of equities and the public interest weigh in favor of injunctive relief, the court denies Plaintiff's Motion for Preliminary Injunction. Because the court denies Plaintiffs' Motion for Preliminary Injunction, it denies as moot Plaintiff's Motion for Imposition of a Nominal Bond. A separate Order accompanies this Memorandum Opinion, which sets the schedule for further proceedings in this matter.

Dated:  January 22, 2016

Amit P. Mehta
United States District Judge