# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| National Parks Conservation Association, | ) |
| Plaintiff, | ) |
| v. | ) |
| United States Forest Service, *et al.*, | )     Civil No. 15-cv-01582 (APM) |
| Defendants, | ) |
| and, | ) |
| Elkhorn Minerals LLC, | ) |
| Intervenor. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

In December 2015, pursuant to permits issued by Defendant United States Forest Service ("Forest Service") and an Operating Plan that the agency had approved, Intervenor Elkhorn Minerals LLC ("Elkhorn Minerals") began mining for gravel on a five-acre parcel of land in Billings County, North Dakota.  The five-acre parcel lies within a 24.6 acre tract of land on which, under the agreed upon Operating Plan, mining operations are expected to continue for the next two to three years.  The surface rights of the 24.6 acre tract are owned by the Forest Service, which acquired those rights in 2007 as part of a 5,200 acre purchase of land surrounding the Elkhorn Ranch Unit of Theodore Roosevelt National Park.  The 5,200 acre purchase was explicitly subject to pre-existing mineral rights, including those within the 24.6 acres now held by Elkhorn Minerals.

Though mining operations began only months ago, more than six years have passed since the Forest Service first received Elkhorn Minerals' plans to extract gravel from the land. Extensive negotiations followed, with the Forest Service mindful throughout of Elkhorn Minerals' valid sub-surface rights, and Elkhorn Minerals equally mindful of the Forest Service's entitlement to limit surface use to that which is reasonable. As negotiations progressed, so too did the Forest Service's efforts to comply with the procedural duties imposed upon it by the National Environmental Policy Act. It this lawsuit, Plaintiff National Parks Conservation Association ("NPCA") challenges the Forest Service's fulfillment of those duties.

NPCA brought this action under the Administrative Procedure Act. It alleges that the Forest Service violated the National Environmental Policy Act by issuing a "Decision Notice and Finding of No Significant Impact," rather than preparing an "Environmental Impact Statement," for Elkhorn Minerals' mining operations. NPCA alleges a host of deficiencies in the Forest Service's actions. It argues that the Forest Service (1) adopted an improperly narrow "purpose and need" statement to evaluate the proposed project; (2) inadequately considered alternatives to approving the project; and (3) failed to take a "hard look" at the project's environmental impacts. NPCA asserts that these deficiencies, along with the precedential and controversial nature of the Forest Service's actions, required the production of an Environmental Impact Statement. NPCA further alleges that the Forest Service's failure to amend the Land and Resource Management Plan for the Dakota Prairie Grasslands—the Forest Service region in which the mining is occurring—violated the National Forest Management Act.

Following the court's denial of NPCA's Motion for a Temporary Restraining Order and its subsequent denial of NPCA's Motion for a Preliminary Injunction, the parties—including Intervenor Elkhorn Minerals—cross-moved for summary judgment. Those Motions for Summary

2

Judgment are now before this court.   Upon consideration of the parties' filings and the Administrative Record, the court finds that the Forest Service has complied with the National Environmental Policy Act and the National Forest Management Act.   It therefore grants the Forest Service's and Elkhorn Minerals' Motions for Summary Judgment in their entirety, and denies NPCA's Motion for Summary Judgment in its entirety.

## II.   BACKGROUND

### A.   Regulatory Framework

#### 1.   *The National Environmental Policy Act*

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment.'"   *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).   It aims to effectuate that policy, "not [by] mandat[ing] particular results, but simply [by] prescrib[ing] the necessary process."   *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989) ("NEPA does not work by mandating that agencies achieve particular substantive environmental results.").   As the Court of Appeals has noted, it "is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision."   *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978)).   NEPA ensures that federal agencies engage in such decisionmaking through certain "'action-forcing procedures,'" *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)), which require them "to consider and report on the environmental effect of their proposed actions," *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir.

2013). The Council on Environmental Quality, a body created by NEPA, promulgates binding regulations that "tell federal agencies what they must do to comply with [NEPA's] procedures and achieve the goals of the Act." 40 C.F.R. § 1500.1.

Specifically, NEPA and its implementing regulations require federal agencies to issue an exhaustive, in-depth analysis document referred to as an Environmental Impact Statement ("EIS") in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must include "detailed statement[s]" about, among other things, "the environmental impact of the proposed action"; "any adverse environmental effects which cannot be avoided should the proposal be implemented"; and "alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii). "The statutory requirement that a federal agency contemplating a major action prepare such an [EIS] serves NEPA's 'action-forcing' purpose" by guaranteeing (1) "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and (2) "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349; *see also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (discussing NEPA's "twin aims").

Because agencies need only prepare an EIS for actions "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), and "as the ecological significance of administrative actions are often less than self-evident," *Humane Soc'y of the U.S. v. U.S. Dep't of Commerce*, 432 F. Supp. 2d 4, 13-14 (D.D.C. 2006), NEPA permits agencies as a first step to prepare an Environmental Assessment ("EA")—a comprehensive but abbreviated analysis of a proposed project's environmental impacts—to determine whether an EIS is necessary, *see* 40

C.F.R. § 1501.3-4.  If, based on a completed EA, an agency determines that a proposal will *not* significantly affect the quality of the environment, it may issue a Decision Notice and Finding of No Significant Impact ("DN/FONSI") instead of proceeding with an EIS.  *Id.* §§ 1501.4(e)(1), 1508.13.  A DN/FONSI includes the EA or a summary of it and "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared."  *Id.* § 1508.13.  It is the adequacy of the EA for Elkhorn Minerals' mining operations and the Forest Service's issuance of a DN/FONSI in lieu of an EIS that Plaintiff challenges here.

### 2. *The National Forest Management Act*

The National Forest Management Act of 1976 (the "NFMA"), 16 U.S.C. § 1600 *et seq.*, requires the Secretary of Agriculture, through the Forest Service, to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." *Id.* § 1604(a).  "In developing the plans, the Service must take both environmental and commercial goals into account."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998).  More specifically, the Forest Service must consider its statutory mandates to develop and administer the national forests "to secure favorable conditions of water flows and to furnish the country with a continuous supply of timber"; "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes"; and "for multiple use and sustained yield of the several products and services obtained therefrom."  *Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 226-27 (D.C. Cir. 2009) (citing 16 U.S.C. §§ 475, 528, 529).

The NFMA imposes a second requirement on the Forest Service.  The NFMA mandates that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands . . . be consistent with the land [and resource] management plans."

16 U.S.C § 1604(i).   In practice, this provision requires the Forest Service to "analyze[] and authorize[] site-specific projects consistent with the governing plan" for the region in which the project is located.  *Montanans For Multiple Use*, 568 F.3d at 227 (citations omitted).  Plaintiff here challenges the adequacy of the Dakota Prairie Grasslands' Land and Resource Management Plan (the "Grasslands Plan") and thus the adequacy of the Forest Service's compliance with the NFMA in connection with the approval of Elkhorn Minerals' mining operations.

### B.     Factual Background

The court has twice summarized the factual background of this case.  *See Nat'l Parks Conservation Assoc. v. U.S. Forest Serv.*, No. 15-cv-01582, 2015 WL 9269401 (D.D.C. Dec. 8, 2015) [hereinafter TRO Op.]; *Nat'l Parks Conservation Assoc. v. U.S. Forest Serv.*, No. 15-cv-01582, 2016 WL 420470 (D.D.C. Jan. 22, 2016) [hereinafter PI Op.], at *2-6.  The court presumes familiarity with the facts as set forth in its prior decisions and thus provides only a recap of the relevant facts below.

In 2007, the Forest Service acquired the 5,200-acre Elkhorn Ranchlands from a private landholder with the goal of "preserv[ing] the integrity and historic character of the area around . . . Theodore Roosevelt['s] Elkhorn Ranch."  FS-002296; *see also* Pl.'s Mem. in Supp. of Mot. for Preliminary Inj., ECF No. 31-1 [hereinafter Pl.'s Mot. for PI], at 4.  "During a three-and-one-half year period between 1884 and 1887, Elkhorn Ranch served as [President Theodore] Roosevelt's 'home ranch.'"  Mot. for Leave to File Amicus Curiae Brief, ECF No. 37, Ex. 1, Proposed Br., ECF No. 37-1, at 5.  The site of President Roosevelt's former "ranch house" is in the Elkhorn Ranch Unit of Theodore Roosevelt National Park—one of the Park's three separate units—which the Elkhorn Ranchlands surrounds.  *See* Pl.'s Mot. for PI at 4.  The Elkhorn Ranchlands is located within the region the Forest Service refers to as the Dakota Prairie Grasslands and is within the

domain of the Forest Service's Medora District Ranger. *See* Defs.' Opp'n to Mot. for Prelim. Inj., ECF No. 35 [hereinafter Defs.' Opp'n to PI], at 6. The Elkhorn Ranchlands is also located within the "Theodore Roosevelt's Elkhorn Ranch and Greater Elkhorn Ranchlands National Historic District," which was created in 2012. *See* FS-000388-575, Environmental Assessment: Elkhorn Gravel Pit [hereinafter EA], at 29.

The Forest Service's 2007 purchase of the Elkhorn Ranchlands was subject to all valid, existing mineral rights. *See* FS-003443-44. In 2009, Elkhorn Minerals co-owner Peggy Braunberger purchased "26.86% [of the] mineral ownership" from one of the "approximately forty different third party surface mineral and/or subsurface mineral owners," whose rights pre-existed the Forest Service's 2007 acquisition, and "were not available for purchase by the government" at that time. EA at 6. On February 9, 2010, Braunberger submitted to the Medora District Ranger the "initial Operating Plan to mine and develop" the 24.6 acre tract at issue in this case (the "Gravel Pit"). *Id.* at 4, 11. On September 1, 2011, after "approximately eighteen months of negotiations" with the Forest Service, Braunberger submitted her final Operating Plan, *id.* at 4, 19, which then underwent a public comment period, *see* FS-000628-740.

From May 2012 to January 2015, the Forest Service engaged in the public-facing portion of the process required of it by NEPA. The Forest Service sought comments regarding multiple draft EAs, *see* FS-000958-59; FS-000081-151; FS-000974-1086, and, thereafter, "incorporate[d] changes resulting from public and agency input" into future drafts, *see* Defs.' Opp'n to PI at 9. On April 24, 2014, the Forest Service issued a draft DN/FONSI, which underwent a "pre-decisional objection period." *Id.* at 10. More than eight months later, on January 6, 2015, the Forest Service issued the final versions of the 80-page EA and the 19-page DN/FONSI. *See generally* EA; FS-000576-95.

7

Nearly six months later, on May 29, 2015, the Forest Service issued permits to Elkhorn Minerals that authorized the company to use certain access roads and to make use of the land's surface for mining activities through April 1, 2017.  *See* FS-004728-35; FS-004842-53; FS-004617-26.  On December 14, 2015, after a contractor for Elkhorn Minerals improved the roads and performed other "pre-work," the Forest Service issued a "Notice to Proceed" with "Phase 2," "the first of 4 mining phases."  Defs.' Opp'n to PI, Second Decl. of Shannon Boehm, ECF No. 35-1 [hereinafter Boehm Decl.], ¶¶ 4-7.  Each phase "involve[s] an approximately 5-acre sub-site of the overall 24.6-acre authorization.  *Id.* ¶ 7.  As of this date, the court understands that mining operations on the second five-acre subsite—"Phase Three"—have yet to begin.  *See* PI Order, ECF No. 43, at 2 (ordering the Forest Service and Elkhorn Minerals to "provide notice to Plaintiff and the court at least 72 hours before the Forest Service issues any permit that authorizes Elkhorn Minerals to commence mining operations on the next five-acre parcel, *i.e.*, Phase Three"; as of this date, no such notice has been filed).  Mining thus has occurred on no more than five acres of the 24.6 acre parcel.

## C.    Procedural History

On September 29, 2015, Plaintiff NPCA filed its Complaint against the Forest Service and five individuals in their official capacities,[1] seeking declaratory and injunctive relief.[2]  *See generally* Compl., ECF No. 1.  Elkhorn Minerals, as the owner of "the dominant mineral rights at issue in this case," then filed a Motion to Intervene.  *See* Mot. to Intervene, ECF No. 4, at 5.  On

---

[1] The individual Defendants are:  Secretary of the United States Department of Agriculture Tom Vilsack; Chief of the Forest Service Tom Tidwell; Regional Forester for the Northern Region of the Forest Service Leanne Marten; Forest/Grasslands Supervisor for the Dakota Prairie Grasslands Dennis Neitzke; and District Ranger for the Medora Ranger District of the Dakota Prairie Grasslands Shannon Boehm.  *See* Compl. ¶¶ 42-46.

[2] The relief Plaintiff has requested includes a declaration "that the Defendants' approval of the [EA] and [DN/FONSI] for the proposed new Elkhorn Gravel Pit violated" NEPA, the NFMA and the Administrative Procedure Act, Compl. at 26; the "vacating, setting aside, reversing and remanding [of] the [EA] and [DN/FONSI]," along with "any permits that have already been granted," *id.*; and the "[e]njoining [of] Defendants from using the [EA] and [DN/FONSI] in subsequent proceedings, including decisions whether to grant licenses, permits and approvals for the" Gravel Pit, *id.* at 27.

November 9, 2015, in response to Plaintiff's Complaint, the Forest Service filed a Motion to Transfer the case to the District of North Dakota.  *See generally* Defs.' Mot. to Transfer Venue, ECF No. 15.

Before the court had ruled on those pending motions, on November 30, 2015, Plaintiff filed a Motion for a Temporary Restraining Order based on its understanding that mining operations soon would commence.  *See generally* Pl.'s Mot. for TRO, ECF No. 20.  The court denied that Motion because "Plaintiff . . . made an insufficient showing as to both likelihood of success on the merits *and* irreparable harm."  TRO Op. at *2.  Two weeks later and immediately after mining operations had begun, on December 16, 2015, Plaintiff filed a Motion for a Preliminary Injunction. *See generally* Pl.'s Mot. for PI.  On January 8, 2016, the court held a hearing on that Motion.  *See* Dkt. Entry (Jan. 8, 2016).  At the start of the hearing, the court orally granted Elkhorn Minerals' Motion to Intervene and denied the Forest Service's Motion to Transfer.  Mot. Hr'g Tr., Jan. 8, 2016, ECF No. 41, at 3:16-20, 3:22-25, 4:1-10.

On January 22, 2016, the court denied Plaintiff's Motion for Preliminary Injunction.  *See generally* PI Op.  The court found that Plaintiff "failed to carry its burden of demonstrating irreparable harm and . . . failed to show that the balance of equities and the public interest weigh in favor of injunctive relief."  *Id.* at *12.  Accordingly, the court did not need to address Plaintiff's claims on the merits, but set an expedited briefing schedule to consider those issues before the next stage of mining commenced.  *See id.* at 2-3; PI Order at 1.  The merits are now before the court.

## III.   LEGAL STANDARD

Plaintiff, Defendants, and Intervenor have filed Cross-Motions for Summary Judgment as to Plaintiff's NEPA and NFMA claims, which are properly brought under the Administrative

Procedure Act,[3] 5 U.S.C. § 701 *et seq.*  Cross-motions for summary judgment ordinarily are reviewed under the standard set forth in Federal Rule of Civil Procedure 56, which requires a court to grant summary judgment when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  However, in cases such as this one that involve the review of a final agency action, the Rule 56 standard does not apply.  *See Stuttering Found. of Amer. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  Instead, "the district judge sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law."  *Am. Biosci. Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citing cases).  "[T]he court's review is limited to the administrative record," *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)), and its role is limited to "determin[ing] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *see Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation and internal quotation marks omitted).

Section 706 of the Administrative Procedure Act provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When analyzing agency action under "this 'narrow' standard of review—which appropriately encourages courts to defer to the agency's expertise," *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81,

---

[3] Neither NEPA nor the NFMA provides for a private right of action.  Thus, suits under both statutes must be brought under the Administrative Procedure Act.  *See Karst Envtl. Educ. & Prot., Inc. v EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007) ("Our decisions in *Public Citizen I* and *II*, as well as our subsequent decisions reiterat[e] the requirement that NEPA claims must be brought under the APA."); *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) ("The NFMA does not provide for judicial review of Forest Service decisions, and therefore the general review provisions of the APA apply by default.") (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"))).

90 (D.D.C. 2014) *aff'd*, No. 14-cv-5259, 2016 WL 874773 (D.C. Cir. Mar. 8, 2016), courts must determine whether the action at issue was based on "reasoned analysis," *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56-57 (1983).  Generally, an agency has engaged in such analysis when the administrative record indicates it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Where, however, the administrative record indicates that an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it has acted in an arbitrary and capricious manner.  *Id.* Although this standard is not "particularly demanding," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993), and a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted), a court is not to "supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted).

Important here, when reviewing an agency's compliance with NEPA, "because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges [must] correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir.

1991) ("*CAB*") (citing *Baltimore Gas & Elec.*, 462 U.S. at 97-98); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) ("Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions."). Thus, as to Plaintiff's NEPA claims, the court considers only whether the Forest Service complied with NEPA's procedural mandates in preparing the EA and issuing a DN/FONSI for the Gravel Pit.

## IV.   DISCUSSION

### A.   The Forest Service's Compliance with NEPA[4]

Plaintiff argues that the Forest Service failed to comply with several different requirements of NEPA, each of which renders arbitrary and capricious the agency's issuance of a DN/FONSI in lieu of an EIS.  First, Plaintiff argues that the Forest Service's objectives, as set forth in the EA's "purpose and need" statement, were so narrow as to improperly make the Forest Service's approval of mining at the Gravel Pit a foregone conclusion.  *See* Pl.'s Mot. for Summ. J., ECF No. 47 [hereinafter Pl.'s Mot.], at 28-29; *see also* Pl.'s Mot. for PI at 22-24; Compl. ¶ 112(1).  In a related argument, Plaintiff contends that the Forest Service failed to adequately consider alternatives to the Gravel Pit, as required by NEPA.  *See* Pl.'s Mot. at 27-29; s*ee also* Pl.'s Mot. for PI at 23-25; Compl. ¶ 112(2).  Second, Plaintiff argues that the Forest Service neither took a hard look at, nor implemented sufficient measures to mitigate, several of the direct, indirect, and cumulative environmental impacts that will result from operations at the Gravel Pit.  *See* Pl.'s Mot. at 15-24; s*ee also* Pl.'s Mot. for PI at 13-22; Compl. ¶¶ 112(4)-(6).  And third, Plaintiff claims that the

---

[4] Elkhorn Minerals contends that, because the Forest Service lacks the legal authority to prevent it from exploiting its mineral rights, NEPA does not apply.  Intervenor-Def.'s Mot. for Summ. J., ECF No. 45, at 13-23.  Both Plaintiff and Defendant have opposed that view vigorously.  The court, however, need not address Elkhorn Minerals' threshold contention about NEPA's applicability, as it concludes that the Forest Service complied with the statute's mandates.  Nor, consequently, need the court address the Forest Service's contention that Elkhorn Minerals' argument regarding the applicably of NEPA is not properly before this court.  *See* Pl.'s Mot. at 7-8.

presence of two "significance factors" set forth in the CEQ regulations, namely the precedential and controversial nature of the Forest Service's actions, required the production of an EIS.  *See* Pl.'s Mot. at 24-26; s*ee also* Pl.'s Mot. for PI at 13-15.  The court will address each argument in turn.

1.   The EA's "Purpose and Need" Statement and the Forest Service's Consideration of Alternatives

Plaintiff asserts that the "purpose and need" statement that the Forest Service adopted for the EA was impermissibly narrow, rendering the approval of mining operations a foregone conclusion.  Plaintiff also argues that the Forest Service failed to adequately consider certain reasonable alternatives to the plan it ultimately approved.  These two contentions are appropriately addressed together because an agency's purpose and need as to a proposed action—in other words, the objectives or goals that guide its evaluation—"provide the point of reference for a determination whether an alternative is reasonable in the first place." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (internal quotation marks omitted); *see also CAB*, 938 F.2d at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives."). Thus, the court must "first consider whether the agency has reasonably identified and defined its objectives.  The agency's choice of alternatives are, then, evaluated in light of these stated objectives." *City of Alexandria*, 198 F.3d at 867; *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011) ("*TRCP*") ("[D]etermining whether an agency has included all reasonable alternatives requires us to decide first whether the agency has reasonably defined its stated goals.").

a.   The Forest Service's objectives in evaluating the Gravel Pit

Where an agency, as here, is "asked to sanction a specific plan," it must "look hard" at several factors to determine appropriate objectives. *CAB*, 938 F.2d at 196.  The agency must "take

into account the needs and goals of the parties involved in the application" or proposal, and "[p]erhaps more importantly, . . . [must] consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." *Id.*; *see also TRCP*, 661 F.3d at 72-73. Courts are to review the agency's consideration of these factors under the "rule of reason," *see CAB*, *938* F.2d at 195; *TRCP*, 661 F.3d at 73; *City of Alexandria*, 198 F.3d at 867, while according "considerable deference to the agency's expertise and policy-making role," *id.* (citing *CAB*, 938 F.2d at 196). "[A]s long as the agency 'look[s] hard at the factors relevant to the definition of purpose,' [courts] generally defer to the agency's reasonable definition of objectives." *TRCP*, 661 F.3d at 73 (quoting *CAB*, 938 F.2d at 196). Courts shall "reject an 'unreasonably narrow' definition of objectives," however, "that compels the selection of a particular alternative." *Id.* (quoting *CAB*, 938 F.2d at 196).

Here, the Forest Service adopted the following "purpose and need" statement:  "The purpose of this proposal is to implement Forest Service Policy, by documenting concerns, effects, design criteria and stipulations, and conditions of access and surface occupancy for exploration of private minerals in the analysis area." EA at 11.[5]  This purpose and need statement, according to Plaintiff, is "improperly narrow" and "made approval of the gravel pit a preordained conclusion." Pl.'s Mot. at 28.  The Forest Service counters that it "was appropriately defined based on the purpose of the proposal, the infeasibility of a mineral exchange or purchase, and the scope of the authorities of the Forest Service as the subservient estate." Defs.' Mot. for Summ. J., ECF No. 46, [hereinafter Defs.' Mot.], at 11.  "The decision before the Agency was not whether or not to allow

---

[5] The EA's purpose and need statement also notes that the Grasslands Plan "has identified mineral development as a valid use.  The Plan states that the Forest Service will honor all valid existing mineral rights." EA at 11.  It continues, stating that "Elkhorn Minerals LLC has submitted an [Operating Plan] to develop the gravel pit" and its "percentage of the mineral rights has been validated." *Id.*

the gravel mine to be built," the Forest Service asserts, but was to "evaluate[] the contours of the potential operations." *Id.* at 14.  The court agrees.

     i.  *"Needs and goals" of Elkhorn Minerals*

  In evaluating the "needs and goals of the parties involved in the application," an agency necessarily must take into account at least two considerations.  First, it must consider the requesting party's interest in the project, and second, it must consider the extent of the agency's authority to approve or modify the project.  *See CAB*, 938 F.2d at 199.  Here, the requesting party's interest in the project is obvious—Elkhorn Minerals' desire to exercise its mineral rights, which "were reserved or outstanding when the United States acquired the surface" in 2007.  EA at 5.

  The extent of the Forest Service's authority to approve or modify the proposed project requires a more extended discussion.  In *Duncan Energy Co. v. U.S. Forest Service*, 50 F.3d 584 (8th Cir. 1995), the Eighth Circuit was presented with the precise question at issue here:  To what extent may the Forest Service regulate access to privately held mineral rights found beneath land it owns within the State of North Dakota?  *See id.* at 589 ("The only issue before us is the Forest Service's ability to regulate surface access to outstanding mineral rights.").  The Eighth Circuit determined that, "[u]nder North Dakota law, the mineral estate is dominant, carrying 'inherent surface rights to find and develop the minerals.'"  *Id.* at 588 (citing *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979)).  As a result, even where the Forest Service controls the rights to the surface sitting atop the mineral estate, it has no "'veto authority' over mineral development."  *Id.* at 589.  Notwithstanding that conclusion, the Eighth Circuit declared, the "mineral developer's rights . . . are not unrestricted."  *Id.* at 588.  The developer is "limited to so much of the surface and such use thereof as are *reasonably necessary* to explore, develop, and transport the minerals."

*Id.* Thus, the Eighth Circuit held, "we are convinced that the [agency] has the limited authority . . . to determine the reasonable use of the federal surface." *Id.* at 591.

As in *Duncan Energy*, the Forest Service here had only the "limited authority" "to determine the reasonable use of the federal surface." It did not have the authority, short of effectuating a taking—which the court discusses below—to prevent Elkhorn Minerals from exploiting its mineral rights. Plaintiff's criticism that the EA's "purpose and need" statement made approval of the project inevitable is thus misplaced. The EA's stated objective—to "implement Forest Service Policy, by documenting concerns, effects, design criteria and stipulations, and conditions of access and surface occupancy," EA at 11—was consistent with the Forest Service's limited authority to determine the use of the federal surface. It therefore was reasonable. The Forest Service was not required, contrary to Plaintiff's contention, to craft a purpose and need statement that contemplated an exercise of authority that the agency did not have—denying access altogether to Elkhorn Minerals' dominant sub-surface rights.

### ii.     *The views of Congress*

The views of Congress also support a finding that the Forest Service's objectives were reasonable. The federal legislation that authorized the Forest Service's purchase of the Elkhorn Ranchlands is contained in Section 424 of the Consolidated Appropriations Act of 2008 (the "2008 Appropriations Act"), Pub. L. No. 110-11, 121 Stat. 1844 (2008) (authorizing the sale of "5,195 or 5,205 acres of National Forest System lands" in order "[t]o offset the acreage acquired by the Federal Government upon the acquisition of the Elkhorn Ranch"). In authorizing the purchase, Congress expressly stated that "the multiple uses of the acquired Elkhorn Ranch shall continue." *Id.* § 424(h). In the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 528 *et seq.*—one of the "two venerable statutes [that] set forth the Forest Service's management goals," *Montanans*

16

*For Multiple Use*, 568 F.3d at 226—Congress defined "multiple uses," in part, as "management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people." 16 U.S.C. § 531; *see also* 16 U.S.C. § 1601 ("It is the policy of the Congress that all forested lands in the National Forest System shall be maintained in . . . conditions . . . designed to secure the maximum benefits of multiple use sustained yield management."). Consistent with Congress' intent, the Forest Service regulations make clear that mineral exploration and development are among the multiple uses permitted within the national forests. *See generally* 36 C.F.R. § 251.15 (Forest Service regulation setting forth the specific "[c]onditions, rules and regulations to govern [the] exercise of mineral rights reserved in conveyances to the United States"); *see also Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 679 (D.C. Cir. 1982) (analyzing the Forest Service's "approv[al of] a plan of operations for exploratory mineral drilling" on Forest Service-controlled land).[6]

Accordingly, Congress' express statement in the 2008 Appropriations Act that multiple uses shall continue in the Elkhorn Ranchlands belies Plaintiff's assertion that the Forest Service was empowered to prohibit Elkhorn Minerals' exercise of its valid, preexisting mineral rights. In light of the views expressed by Congress, the Forest Service's objectives for evaluating the proposal for the Gravel Pit were reasonable.

---

[6] Congress' view regarding multiple use of the Elkhorn Ranchlands, as expressed in the 2008 Appropriations Act, accords with the mandate it set forth in the Alaska National Interest Lands Conservation Act ("ANICLA"), 16 U.S.C. § 3101 *et seq.* In that statute, Congress wrote that "the Secretary [of Agriculture] shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure to the owner the reasonable use and enjoyment thereof." 16 U.S.C. § 3210(a). Although ANICLA, in general, applies to national forests in Alaska, courts have determined that its "reasonable use" provision has a "nation-wide effect," and is thus applicable to national forests throughout the United States. *Montana Wilderness Ass'n, Nine Quarter Circle Ranch v. U.S. Forest Serv.*, 655 F.2d 951, 954 (9th Cir. 1981), *cert. denied*, 455 U.S. 989 (1982). Thus, under ANICLA, the Forest Service was required to provide access to Elkhorn Minerals sufficient to guarantee the "reasonable use and enjoyment" of its mineral rights.

iii.     *The Elkhorn Ranchlands "Warranty Deed"*

The "Warranty Deed" that effectuated the Forest Service's purchase of the Elkhorn Ranchlands set forth a further limitation on the agency's authority.  The Warranty Deed expressly "[r]eserv[ed] [u]nto the Grantor"—the land's seller—"[a]ll metals, ores and minerals of any nature whatsoever in or upon the [Elkhorn Ranchlands] and including . . . gravel that may be owned together with the right to enter upon said lands for the purpose of [mining operations] and to occupy and make use of so much of the surface of said land as may be reasonably necessary[.]" FS-004513; *see also* EA at 7 (quoting FS-004513); Boehm Decl. ¶ 3 ("All transaction documents made clear that surface and subsurface minerals were not included in the acquisition of Elkhorn Ranchlands.").  No party, including Plaintiff, disputes that the mineral rights now held by Elkhorn Minerals pre-date the 2007 acquisition of the Elkhorn Ranchlands.  Thus, in accordance with the express terms of the Warranty Deed, Elkhorn Minerals was entitled to explore and develop its valid mineral rights, using the Forest Service-controlled surface "as may be reasonably necessary."  The Warranty Deed's express reservation of mineral rights further supports the reasonableness of the Forest Service's objectives here.

\*               \*               \*

In summary, this is not a case in which the federal government owned outright the land that a private party sought to use.  In such a case, the Forest Service would have greater discretion over whether to allow special use of the land and, correspondingly, would have a broader range of objectives available to it.  Here, by contrast, Elkhorn Minerals held valid mineral rights that pre-dated the Forest Service's acquisition of the surface; the acquisition was explicitly subject to existing mineral rights; the existing mineral rights are dominant over surface rights under North Dakota law; and the views of Congress mandate that such mineral rights be respected.  "An agency

18

cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving *its* goals, shaped by the application at issue and by the function that the agency plays in the decisional process." *CAB*, 938 F.2d at 199. That is exactly what the Forest Service did here. The court therefore finds that the EA's purpose and need statement did not violate NEPA.

b.     The Forest Service's evaluation of alternatives

The court now turns to the Forest Service's evaluation of alternatives, which the CEQ regulations implementing NEPA refers to as the "heart of the [EIS]" or EA. 40 C.F.R. § 1502.14. The CEQ regulations require agencies, in preparing an EIS or EA, to "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* § 1502.14(a). The determination—by both agencies and courts—of whether an alternative is "reasonable," is guided by the same "rule of reason" that instructs the court's evaluation of objectives. *See CAB*, 938 F.2d at 195-96; *TRCP*, 661 F.3d at 73. That rule of reason "necessarily governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir. 1978) (emphasis added) *vacated in part sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978); *see also Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) ("NEPA's requirement of a discussion of alternatives . . . should be superintended according to a 'rule of reason.'").

Accordingly, agencies must discuss in detail those alternatives that are "objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *TRCP*, 661 F.3d at 72 (quoting *City of Alexandria*, 198 F.3d at 867); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 551 (1978) ("[T]he concept of alternatives [under NEPA] must be bounded by some notion of feasibility"); 43 C.F.R. § 46.420(b) ("Reasonable alternatives . . . include[] alternatives that are technically and economically practical or feasible

19

and meet the purpose and need of the proposed action."). On the other hand, if a proposed alternative is infeasible; "will [not] bring about the ends of the federal action," *CAB*, 938 F.2d at 195; or is "remote and speculative," *Natural Res. Def. Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972), it does not require a detailed discussion. Indeed, CEQ regulations instruct that "an agency need only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable alternatives.'" *Tongass Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1141 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14(a)). Courts are to defer to an agency's assessment, "uphold[ing a] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *CAB*, 938 F.2d at 196.

Here, Plaintiff argues that the Forest Service "failed to 'rigorously explore and objectively evaluate' several reasonable alternatives, including": (1) "an exchange of the mineral rights for other property rights or gravel in equal volumes"; (2) "buying the mineral rights"; (3) "conducting a taking"; and (4) "pursuing a [Grasslands] Plan amendment and [imposing] additional mitigation measures" based on the amendment. Pl.'s Mot. at 28; *see also* Pl.'s Response Memo. of Law in Supp. of Pl.'s Mot. for Summ J., ECF No. 51 [hereinafter Pl.'s Resp.], at 8 ("[T]the Forest Service could have pursued an exchange of land or minerals, acquired the mineral rights, conducted a taking, or pursued an amendment to the [Grasslands] Plan and adopted additional mitigation measures pursuant to the amendment."). Plaintiff asserts that the Forest Service's "cursory discussion in the EA about those reasonable alternatives—and its complete failure to consider both condemnation of the mineral rights . . . or imposition of additional mitigation measures—does not constitute the hard look required by NEPA." Pl.'s Mot. at 28. The court disagrees.

###### i.   *Exchange of mineral rights*

Plaintiff contends that the Forest Service inadequately considered an exchange of Elkhorn Minerals' sub-surface rights for other rights or property located elsewhere.  Plaintiff does not claim that the Forest Service failed to consider this alternative at all.  Instead, its argument appears to be that although the Forest Service considered an exchange, it did not work hard enough to effectuate it.  *See* Pl.'s Mot. at 28 ("[T]he record shows that the Forest Service was, in fact, looking into an exchange of land or minerals before commencing the EA, although there is no evidence in the record that the Forest Service ever provided a specific exchange proposal to the mineral owners, even after more than a year of looking into it."); Pl.'s Resp. at 11 ("It appears from the record that an exchange . . . was not carried out in part due to the Forest Service's own failure to diligently explore and pursue th[at] option[].").  The record shows otherwise.  The Forest Service undertook substantial efforts to pursue an exchange and ceased its efforts only when the alternative proved infeasible.

On July 18, 2012, the Forest Service halted its ongoing NEPA review of the Gravel Pit and entered into an "Agreement in Principle" with Elkhorn Minerals' co-owners, Peggy Braunberger and Roger Lothspeich.  *See* FS-003914.  The Agreement in Principle's "sole purpose [was] negotiating an exchange of minerals."  Defs.' Mot. at 15; *see also* FS-003914 (listing seven conditions that Braunberger, Lothspeich, and the Forest Service "agreed to, in principle, as objectives for accomplishing an exchange between [the parties]").  Among the types of exchanges the Agreement in Principle contemplated were "mineral ownership for land ownership, gravel ownership for gravel ownership, or mineral ownership for mineral ownership."  FS-003914; *see also* FS-003915 (listing legally feasible exchanges).

The Forest Service pursued these exchanges despite the many hurdles that they presented, including:  the need for congressional approval; the involvement of a multitude of government agencies and other bodies; the receipt of administrative approvals; the threat of liability posed by chemicals present at the site of the Gravel Pit; and, perhaps most problematic, the existence of many other mineral rights holders in the area adjacent to the Elkhorn Ranch Unit.  EA at 20-21. "Over the years, the surface and subsurface mineral estates [in the area of the Gravel Pit were] split and sold," EA at 19, and at the time the EA was issued "there [we]re approximately forty different third party surface mineral and/or subsurface mineral owners," *id.* at 6, some of whom leased their rights to yet other parties, *id.* at 21.  Thus, an exchange of Elkhorn Minerals' rights alone, and even an exchange involving Elkhorn Minerals' and other parties' rights, would not necessarily prevent mineral development in the area.  As the Forest Service wrote in the EA:

> Development could only be abated by obtaining 100% of the mineral rights which would also require 100% willing sellers.  And even then, there could still be issues pending the expiration of existing leases and the potential for lease right development.  Anything less than 100% would not guarantee government control and the result is status quo that mineral development could occur at any given time at the discretion of the mineral owners.

*Id.*  In other words, an exchange of Elkhorn Minerals' rights with rights or property elsewhere would not necessarily—and perhaps, not likely—have prevented the mineral development that Plaintiff seeks to avert.

Because of the divided mineral ownership as well as the other hindrances discussed above, an exchange proved infeasible.  On August 2, 2013, after more than a year of negotiations, Braunberger and Lothspeich exercised their right to withdraw from the Agreement in Principle. *See* FS-003916-19; *see also* EA at 20-21.  In a letter to the Forest Service, counsel for Braunberger and Lothspeich explained that his clients chose to withdraw "because of the lack of progress that has occurred over the past year in pursuing the mineral exchange option, and because of various

22

acknowledged feasibility problems which have arisen[,] raising questions about whether it is realistic to hope to achieve the mineral exchange as a solution." FS-003916.  Although the letter indicated that Braunberger and Lothspeich "remain[ed] open to considering alternative resolutions"—and, in fact, the Forest Service continued to pursue an exchange for the next 15 months,[7] *see* EA at 22—Braunberger and Lothspeich's counsel "request[ed] that the Forest Service . . . bring the Operating Plan review process to a favorable conclusion expeditiously," FS-003917.

Based on this record, the court finds that the Forest Service took the required hard look at the mineral rights exchange alternative.  Notwithstanding Elkhorn Minerals' withdrawal from the Agreement in Principle and the substantial, potentially insurmountable obstacles in its way, the Forest Service pursued an exchange until just months before it issued the EA and DN/FONSI.  *See supra* note 7.  And, although an exchange was arguably infeasible, remote, and speculative, the EA discussed the alternative and explained why it was not executed.  That is all NEPA requires. *See Tongass*, 924 F.2d at 1141 (quoting 40 C.F.R. § 1502.14(a)).

## ii.    *Purchase of mineral rights*

Plaintiff raises the same argument as to the Forest Service's failure to adequately consider an outright purchase of Elkhorn Minerals' rights—that the Forest Service did not try hard enough to execute a transaction.  Pl.'s Resp. at 11 ("It appears from the record that [a] . . . purchase was not carried out in part due to the Forest Service's own failure to diligently explore and pursue th[at] option[].").  As with Plaintiff's complaints about the Forest Service's evaluation of an exchange,

---

[7] In a November 13, 2014, email to Dakota Prairie Grasslands Supervisor Dennis Neitzke, sent less than two months before the Forest Service issued the final EA and DN/FONSI, Elkhorn Minerals' counsel wrote:

> We appreciate your recent informal efforts to explore whether Elkhorn Minerals LLC would be willing to donate its gravel mineral rights or enter into an attempted negotiation of a mineral exchange . . . [but w]e believe that we have been more than patient . . . [and] request that the Forest Service bring the review processes for this project to a conclusion forthwith.

FS-003971-72.

the court finds this assertion meritless.   The mineral purchase alternative faced issues "very similar" to those that plagued the exchange, including the problem of divided ownership.   *See* EA at 19-20.   Those issues ultimately rendered the alternative infeasible, and the EA explains as much. *Id.*   The Forest Service's evaluation of a mineral purchase and discussion of that alternative in the EA thus fulfilled the agency's NEPA obligations.

### iii.   Conducting a taking

Plaintiff also argues that the Forest Service inadequately considered conducting a taking of the Gravel Pit.   Plaintiff asserts that "a taking was not evaluated at all."   Pl.'s Resp. at 4.   It contends that the Forest Service "had the right and authority to [conduct a taking] under the Fifth Amendment, the Department of Agriculture Act of 1956, and federal takings statutes," and asserts that "the agency's discomfort with a taking does not render that alternative unreasonable."   *Id.* at 11.   As support for its position, Plaintiff points to statements in the EA indicating that the Forest Service "has the authority to deny the request to mine gravel and to conduct a legal taking."   Pl.'s Mot. at 6; *see also id.* at 13 ("The fact that the agency acknowledged that it could conduct a taking, but chose not to do so, does not divest the Forest Service of its ability to prevent or otherwise regulate mining on its lands.").

As an initial matter, Plaintiff's assertion that "a taking was not evaluated at all" is flatly contradicted by the record.   The Forest Service *did* consider a taking.   The "No Action Alternative" that the Forest Service evaluated throughout the EA *is* a taking.   When introducing the No Action Alternative, the Forest Service stated:

> This alternative is not legal due to the *taking* of private mineral rights.   The Forest Service does not have authority to deny the exercise of a mineral reservation or outstanding mineral right. . . .   A denial, or *takings*, would likely result in a lawsuit and a court settled compensation to the mineral owner(s).

EA at 23 (emphasis added); *see also id.* at 13.   Although the Forest Service clearly considered conducting a taking, it determined that its limited authority and its reasonable objectives—which, as discussed above, "delimit[ed] the universe of the action's reasonable alternatives," *CAB*, 938 F.2d at 195—rendered a taking infeasible.   In a document appended to the EA addressing public comments, the Forest Service thoroughly explained its consideration of a taking:

> All parties involved in the acquisition of the Elkhorn Ranchlands were aware of the fact that the private mineral estates were not offered as part of the acquisition.   The Forest Service agreed to honor all valid existing mineral rights and other encumbrances at the time of the acquisition, including the surface mineral rights. The acquisition was successful because of the multiple use concept of the Forest Service.
>
> The mineral holder does have a right to access their minerals as per the terms of their deeded rights.   However, that does not imply that the access is carte blanche. . . .   The Forest Service can determine what level of access is adequate to allow the owner reasonable use and enjoyment of their mineral rights. . . .
>
> The Forest Service could deny the use which would result in a legal mineral taking. This would be inconsistent with the terms of the acquisition and would also be inconsistent with years of [Grasslands Plan] direction . . . honoring valid rights. The result of takings would likely be a legal action against the government by the surface and subsurface mineral owners affected.

FS-000553.   And, a draft version of the above response offered an additional reason as to why a taking was infeasible:   "At this point and time there is neither internal agency support nor external political support to deny the exercise of the mineral rights."   FS-001313.

Under the rule of reason, the Forest Service's evaluation of a taking was adequate.   As the Court of Appeals stated in *Natural Resources Defense Council v. Morton*, "NEPA was not meant to require detailed discussion of the environmental effects of 'alternatives' . . . available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed."   458 F.2d at 838.   The Forest Service considered a taking, determined that lengthy and costly litigation would likely result if the

alternative was pursued, and as with the exchange or purchase of mineral rights, reasonably concluded that a taking was infeasible.

> iv. *Amending the Dakota Prairie Grasslands' Land and Resource Management Plan and implementing additional mitigation measures*

Finally, Plaintiff contends that the Forest Service failed to adequately consider as an alternative amending the Dakota Prairie Grasslands' Land and Resource Management Plan, or the Grasslands Plan, and implementing additional mitigation measures pursuant to the amended plan. This argument suffers from two fatal flaws.  First, as the court concludes below, *see infra* Part IV.B, the NFMA did not require the Forest Service to issue an amended Grasslands Plan before conducting its NEPA analysis of the Gravel Pit.  And second, Plaintiff fails to identify *any* feasible mitigation measures that would have been implemented had the Forest Service amended the Grasslands Plan.  After the Forest Service argued in its Motion that "Plaintiff has not proffered a single mitigation measure left unstudied," Defs.' Mot. at 15, Plaintiff alleged one such measure in its Response:  "Th[e] amendment would have provided clear guidelines regarding what additional mitigation measures were necessary that the agency did not contemplate here, possibly including a No Surface Occupancy restriction for the Elkhorn Ranchlands."  Pl.'s Resp. at 12.  But, as discussed, under *Duncan Energy*, the "No Surface Occupancy restriction" would have been unlawful. *See supra* Part IV.A.1.  Amending the Grasslands Plan therefore would not have resulted in any mitigation measure the Forest Service did not already consider.[8]

Moreover, the Forest Service *did* in fact consider issuing an amended Grasslands Plan, but deemed it unnecessary.  As the EA explains:

---

[8] Plaintiff raises a second mitigation measure that it claims the Forest Service inadequately considered:  restoration of the mined area to its original height.  *See* Pl.'s Resp. at 12.  Plaintiff raised this measure, not in connection with its argument that the Forest Service should have amended the Grasslands Plan, but in support of its assertion that the agency insufficiently mitigated the Gravel Pit's impacts on the viewshed.  However, as the court discusses below, *see infra* Part IV.A.2.b, the Forest Service did adequately consider and discuss that mitigation measure.

> Resource protection standards and guidelines, including the protection of historic, scenic, and valid mineral rights, are included within Chapters 1 and 2 of the current [Grasslands Plan].   The importance of the ranchlands have been taken into consideration in developing the site specific operating plan stipulations to both honor the private mineral rights and provide protection to the Historic District.  The bas[e]s for all of the mitigation measures all originated from the current [Grasslands Plan].   However, the negotiated stipulations are more stringent than would be applied under general [Grasslands Plan] requirements.

EA at 22.  Given the foregoing, it is no surprise that Plaintiff has been unable to set forth a single, lawful mitigation measure "left unstudied."   In the Forest Service's view, no amendment to the Grasslands Plan was required in order to adequately mitigate the harm to the surface.  The court owes deference to that conclusion.  The Forest Service thus adequately considered and discussed the alternative of amending the Grasslands Plan and implementing additional mitigation measures based on the amended Plan.

> 2.      *The Adequacy of the Forest Service's Decision to Issue a DN/FONSI Rather Than Prepare an EIS*

As explained above, NEPA permits agencies to prepare an EA in order to determine whether they are obligated to produce an EIS.  *See* 40 C.F.R. § 1501.3-4.  If an agency concludes from a completed EA that the project at issue will not significantly affect the quality of the environment, it may eschew an EIS and instead publish a DN/FONSI.  *Id.* §§ 1501.4(e)(1), 1508.31.  That is the course of action the Forest Service chose here.  Plaintiff challenges that course as unlawful.

In reviewing an agency's decision to issue a DN/FONSI rather than prepare an EIS, courts must bear in mind that "[a]n agency has broad discretion in making this determination, and the decision is reviewable only if it was arbitrary, capricious or an abuse of discretion."  *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985).  The court's role "is a 'limited' one, designed primarily to ensure 'that no arguably significant consequences have been ignored.'"

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)

(quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)).

Courts are not to "'flyspeck' an agency's environmental analysis, looking for any deficiency no

matter how minor." *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting

*Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1323 (10th Cir. 2004)).  In this Circuit, courts have long

been guided in their analysis of an agency's decision to issue a DN/FONSI by the following four-

step test:

> First, the agency must have accurately identified the relevant environmental
> concern.  Second, once the agency has identified the problem, it must have taken a
> "hard look" at the problem in preparing the EA.  Third, if a finding of no significant
> impact is made, the agency must be able to make a convincing case for its finding.
> Last, if the agency does find an impact of true significance, preparation of an EIS
> can be avoided only if the agency finds that changes or safeguards in the project
> sufficiently reduce the impact to a minimum.

*Sierra Club*, 753 F.2d at 127; *see also TOMAC*, 433 F.3d at 861.

As to the second step—whether the agency took a "hard look" at an environmental

impact—the Court of Appeals has noted that "[a]lthough the contours of the 'hard look' doctrine

may be imprecise, our task is 'simply to ensure that the agency has adequately considered and

disclosed the environmental impact of its actions and that its decision is not arbitrary or

capricious.'" *Nevada*, 457 F.3d at 93 (quoting *Baltimore Gas & Elec.*, 462 U.S. at 97-98); *see also*

*Kleppe*, 427 U.S. at 410 n.21 (1976).  Courts must, however, ensure that the agency took a hard

look at (1) the project's "direct impacts"—those impacts "caused by the action and occur at the

same time and place," 40 C.F.R. § 1508.8(a); (2) its "indirect impacts"—those impacts "caused by

the action and are later in time or farther removed in distance, but are still reasonably foreseeable,"

*id.* § 1508.8(b); and (3) its "cumulative impacts"—those impacts "which result[] from the

incremental impact of the action when added to other past, present, and reasonably foreseeable

28

future actions regardless of what agency . . . or persons undertakes such other actions," *id.* at § 1508.7. As to the fourth step—whether changes or safeguards sufficiently reduce an impact to a minimum—an agency is required to "discuss[ mitigation measures] in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 353. The agency need not, however, present "'a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action.'" *Id.* (quoting *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 819 (9th Cir. 1987)).

In this case, Plaintiff claims that, under the test's second step, "the Forest Service failed to take a hard look at the significant cumulative, direct, and indirect impacts of the" Gravel Pit, Pl.'s Mot. at 15, including its impacts on the "soundscape" (*i.e.*, the noise level), "viewshed" (*i.e.*, the view and landscape), and golden eagles, *id.* at 17-24. Accordingly, under the third step, Plaintiff contends that the "Forest Service could not and did not 'ma[k]e a convincing case' that the impacts of the proposed gravel pit are insignificant." Pl.'s Mot. for PI at 12. Under the fourth step, Plaintiff argues that the Gravel Pit's adverse impacts "are not fully mitigated by the measures described in the EA," Pl.'s Mot. at 19, asserting that "because the Forest Service did not adequately evaluate those impacts, it could not and did not fully mitigate them," *id.* at 2. Thus, under the four-step test set forth by the Court of Appeals, Plaintiff contends that the "Forest Service's 'finding of no significant impact' should be set aside." *Id.* at 16.

Plaintiff also offers an additional argument as to why the Forest Service's decision to issue a DN/FONSI rather than prepare an EIS was unlawful: The Forest Service's finding of no significant impact, and thus its issuance of the DN/FONSI, should be set aside because of the presence of two significance factors set forth in the CEQ regulations, each of which demands the production of an EIS. Plaintiff argues that the Forest Service's conduct with regard to the Gravel

Pit is precedential, *id.* at 24-25, and contends that the Gravel Pit is "highly controversial," *id.* at 26.

The court first addresses whether the Forest Service took a hard look at each of the Gravel Pit's environmental impacts that Plaintiff argues is insufficiently mitigated.   It then addresses Plaintiff's arguments regarding the two significance factors.

a.    Impacts on the soundscape

The bulk of Plaintiff's criticism of the Forest Service's evaluation of environmental impacts centers on the increased noise that will result from mining operations at the Gravel Pit. As to *direct* impacts on the soundscape, Plaintiff notes that, according to the EA, the "gravel pit will produce an average of 65 decibels of noise," which will cause the "noise level at the National Park [to] more than quadruple . . . even without adding in other cumulative impacts." *Id.* at 20.   It argues that the temporary nature of the noise "does not preclude [it] from being 'significant under NEPA,'" *id.* at 20 n.2, particularly where mining operations are likely to take place from "April to November, . . . when most of the National Park's visitors" enjoy Theodore Roosevelt National Park, *id.* at 21.   As to *cumulative* impacts, Plaintiff asserts that the EA references "a 'variety of' other sources of noise, including an existing oil and gas well that is 1,600 feet north of the mine site, truck traffic, more oil and gas wells that 'more than likely will be developed within the area,' and 'year round noise associated with motors, pumps, and production equipment,'" but fails to "discuss how many decibels above the maximum outdoor noise level these cumulative noises, added to the gravel pit's noise, will reach." *Id.* at 17 (quoting EA at 47).   Further, Plaintiff asserts, "the EA acknowledges, and the record shows, that additional gravel mining is 'foreseeable'— indeed 'high[ly] probab[le]'—'within the same vicinity' as the Elkhorn gravel pit," but the "Forest Service's discussion of cumulative effects on [the] soundscape neither mentions additional gravel

pits in the vicinity nor provides any analysis of what noise impacts those additional mines will

generate." *Id.* at 18 (quoting EA at 33).

It is not surprising that Plaintiff focuses on noise impacts. So, too, did the Forest Service

in the EA, devoting eight pages of analysis to the Gravel Pit's impacts on the soundscape. EA at

40-47. That the Forest Service took a hard look at the increased noise is evident from those pages.

The court first addresses the Forest Service's evaluation of direct impacts on the soundscape and

then discusses the agency's assessment of cumulative impacts on the same.

i.      *Direct impacts on the soundscape*

To assess the Gravel Pit's direct impacts on the soundscape, the Forest Service used an

"Acoustical Monitoring Report" provided by Theodore Roosevelt National Park; identified "all

existing contributing noises within a one-mile radius of" the Park; and conducted scientific

mapping in order to determine the average noise level—approximately 50 decibels—in the Gravel

Pit area before the start of mining operations. EA at 40-42; *see also* FS-002604-08 (March 25,

2014, "Report On Noise Buffer Zones For The Elkhorn Ranch Gravel Pit," on which the EA

relied). The Forest Service then assessed the additional noise that would be generated from each

mining-related activity. It determined that "noise from the mining and hauling operations" would

"clearly be noticeable from within" Theodore Roosevelt National Park, at an average of 65

decibels, before factoring in the effects of mitigation measures. EA at 43-47; *see also* FS-002609-

12. The Forest Service then listed seven noise-specific mitigation measures that "will reduce but

not eliminate the impacts." EA at 47. Indeed, the Forest Service acknowledged that the increased

noise "may be an 'adverse effect' to historic properties" within the National Park. *Id.* at 45. The

Forest Service has asserted, however, that the 65 decibel pre-mitigation average "equates [only] to

a normal speaking voice level at a distance of one to two meters."  Defs.' Mot. at 20 (citing FS-002612).

Plaintiff has pointed to nothing that the Forest Service failed to consider or neglected to disclose, arguing only that the Gravel Pit will, at times, be too loud.  Nor has Plaintiff suggested any mitigation measure that the Forest Service erroneously omitted.  As the Court of Appeals stated in *CAB* with regard to a soundscape analysis conducted by the Federal Aviation Administration ("FAA"):

> In examining the impacts of noise on the environment, the FAA relies on wisdom and experience peculiar to the agency and alien to the judges on this court.  We have thus held consistently that the rule of reason guides every aspect of the FAA's approach, including its choice of scientific method. . . .  [H]ere . . . the FAA proceeded to mold a body of data, dissect it, and display it in comprehensible forms.  The agency's choice of method was obviously not capricious.  Nor were the factual conclusions that followed.

*CAB*, 938 F.2d at 200-201 (citations omitted).  This court finds the same to be true here.  The Forest Service took a hard look at the direct impacts of increased noise, utilizing its expertise to inform its methods and conclusions.  It then instituted mitigation measures that sufficiently reduced the direct impacts on the soundscape to a minimum.  NEPA requires no more.

*ii.*     *Cumulative impacts on the soundscape*

The court turns now to the Forest Service's evaluation of cumulative impacts on the soundscape.  To the extent Plaintiff claims that the Forest Service failed to consider *existing* noise, such as that from active oil and gas wells, it is incorrect.  As discussed above, the Forest Service's acoustic analysis included noise from ongoing activities, *see* EA at 42 (table assessing current noise sources, including "Trucks," "Pump Jack," "Drilling Rig," and "Diesel Engines"); FS-002604-08, and factored those sounds into its determination that the noise level without the Gravel Pit was approximately 50 decibels, *id.* at 41, 43.  The Forest Service thus adequately considered

the impacts of pre-existing noise; Plaintiff has offered nothing to support a contrary conclusion. *See Town of Cave Creek, Az. v. FAA*, 325 F.3d 320, 328-29 (D.C. Cir. 2003) (finding cumulative impacts analysis of noise to be adequate, in part, because the agency "indisputably examine[d] both the incremental impact of the project *as well as the environmental baseline*" (emphasis added)).

Plaintiff's contention that the Forest Service failed to analyze noise that will result from reasonably foreseeable *future* activity, such as additional gravel mining, merits closer scrutiny. Indeed, the EA does list the following as "Foreseeable Actions": a "proposed roadway" across the Little Missouri River; additional oil and gas development, including a "proposed . . . well [that] has been submitted and is on hold by the Operator"; "a high probability" of additional gravel mining; and the replacement or modification, "within the next 5-15 years," of existing encumbrances, such as pipelines and utility lines. EA at 33. The EA states that these activities "are likely to occur in the vicinity of the proposed Elkhorn Gravel Pit project and may contribute to cumulative effects." *Id.* Although the Forest Service referenced these "foreseeable actions" in the section of the EA addressing cumulative impacts on the soundscape, *see* EA at 49-50, Plaintiff is correct that the Forest Service did little to quantify their effects.

The court nevertheless finds that, even though the EA's cumulative impacts analysis as to the soundscape could have been more robust, it was not arbitrary and capricious. As the Court of Appeals has stated, the purpose of the cumulative impacts analysis "requirement is to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Hodel*, 865 F.2d at 297 (citation and internal quotation marks omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). For that reason, courts in this

Circuit—such as the Court of Appeals in *Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002), *as amended* (Aug. 27, 2002), and the court in *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006), two of the principal cases on which Plaintiff relies—have found arbitrary and capricious the failure to consider the impacts of projects that were *authorized* at the time the agency conducted its NEPA analysis. *See Grand Canyon Trust*, 290 F.3d at 345 (finding the FAA's cumulative impacts analysis of noise to be inadequate where the agency "had not evaluated *existing* noise impacts [or] those planned impacts that *will exist* by the time the new facility is constructed and in operation" (emphasis added)); *Mainella*, 459 F. Supp. 2d at 107 ("NPS also has barely responded to plaintiffs' contention that NPS failed to consider the cumulative impacts of eleven other wells that operators have been *authorized* to drill from surface locations outside of the Gore Baygall Unit to downhole targets within the Unit, *and three active wells* within that Unit." (emphasis added)). For that same reason, the Supreme Court has held that NEPA's cumulative impacts requirement demands that "proposals for . . . *related* actions that will have [a] cumulative or synergistic environmental impact upon a region *concurrently pending before an agency* must be considered together." *Kleppe*, 427 U.S. at 410 (emphasis added). This is because "[o]nly through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Id.*

On the other hand, when an agency's cumulative impacts analysis has excluded projects that were neither authorized by, nor pending before, an agency, nor related to the project at issue in the case, courts have found such analysis to be adequate. For example, in *Theodore Roosevelt Conservation Partnership v. Salazar*, the appellants asked the court to find arbitrary and capricious the Bureau of Land Management's failure to consider in its cumulative impacts analysis "two [unrelated] projects [that] began years after the Bureau began its analysis on the Atlantic Rim

Project[—the project at issue—]but, at least in conceptualization, overlapped in time with the Bureau's consideration of its EIS for the Atlantic Rim Project." 616 F.3d at 512. The court disagreed with the appellants, writing:

> [T]he incipient notion of the two projects expressed in notices of intent to prepare an EIS for each did not establish reasonable foreseeability of the incremental impact of those projects in connection with the Atlantic Rim Project for purposes of § 1508.7. . . .

> Granted, a project need not be finalized to be "reasonably foreseeable" under 40 C.F.R. § 1508.7. But neither was it arbitrary and capricious for the Bureau to omit from its cumulative impact analysis other projects for which nothing had been completed except notices of intent, each published after the Atlantic Rim Project's draft EIS had been released. The Bureau did not violate NEPA by concluding that these projects were too preliminary to meaningfully estimate their cumulative impacts in the Atlantic Rim Project EIS.

*Id.* at 513; *see also Town of Cave Creek*, 325 F.3d at 331 (agency need not consider noise impacts more than "five years into the future" because, at that point, "[i]t becomes more difficult—as well as increasingly inaccurate—to make projections" and "the difficulties and uncertainties involved in modeling noise levels further than the agency did" render such modeling unnecessary).

The court gleans from these cases the principle that, where a future action is too inchoate to permit an agency to analyze its impacts, it is not arbitrary and capricious for the agency to exclude it from, or lessen its relative import in, its cumulative impacts analysis, even if the agency has labeled the action "reasonably foreseeable." This rule is sensible, as the consideration of such uncertain impacts would not aid—and could in fact muddle—the agency's evaluation of the proposal before it. Such would be the case here, where the future projects discussed in the EA, and raised by Plaintiff in its pleadings, are "too preliminary to meaningfully estimate their cumulative impacts." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 513. The Forest Service was not required to speculate about the potential effects on the soundscape of a "proposed roadway"; a "proposed . . . well [that] . . . is on hold"; or maintenance work "5-15 years" in the

future.  This is particularly true where, as here, the time period relevant to the cumulative impacts analysis for noise is relatively brief—the two to three years during which mining operations will be ongoing.  As the six-year period between Elkhorn Minerals' submission of an initial operating plan and the beginning of mining operations demonstrates, projects can take substantially longer than the life of the Gravel Pit to proceed from proposal to commencement.  The Forest Service's cumulative impacts analysis regarding the soundscape thus was not arbitrary and capricious.[9]

b.  <u>Impacts on the viewshed</u>

Plaintiff challenges the Forest Service's analysis of the Gravel Pit's direct impacts on the viewshed; it does not, however, challenge the Forest Service's indirect or cumulative impacts analysis on that aspect of the environment.  Plaintiff argues that the "decades-long delay to reclaim land [after mining operations are completed], which the Forest Service acknowledges may take place here[,] . . . is 'significant' under NEPA."  Pl.'s Mot. at 24.  But similar to its challenge to the Forest Service's analysis of direct impacts on the soundscape, Plaintiff has failed to identify any aspect of the Gravel Pit's impact on the viewshed that the Forest Service inadequately evaluated.  Nor has Plaintiff advanced any mitigation measure that the Forest Service reasonably could have, but failed, to implement.

The record reflects that the Forest Service conducted an extensive evaluation of the Gravel Pit and the surrounding land, which included preparing a 40-page "Elkhorn Gravel Pit [Geographical Information Systems] Report" that contained detailed maps and analysis of the area.  *See* FS-002255-94.  In the EA, the Forest Service acknowledged that operations at the Gravel Pit

---

[9] The other case on which Plaintiff relies, *Citizens Exposing Truth About Casinos v. Norton*, No. 02-cv-1754, 2004 WL 5238116 (D.D.C. Apr. 23, 2004) *aff'd sub nom. Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007), is inapposite.  There, the EA "gloss[ed] over . . . potential cumulative impacts, claiming that they will, in effect, be rendered inconspicuous over time by the development anticipated to occur naturally."  *Id.* at *8.  Nowhere has the Forest Service claimed that it need not consider a future project here because its impacts will be insignificant due to the vastness of future development.

will cause "an average elevation drop of eight feet within the pit area," EA at 37, 50, 52, which "may detract from the overall integrity of the Elkhorn Ranchlands [National Historic District]," *id.* at 39. But the Forest Service designed, and Elkhorn Minerals agreed to, a host of mitigation measures aimed at reducing the impacts on the viewshed to a minimum. *See* EA at 53; Defs.' Mot. at 22 n.9. Although it "may take decades to reclaim the overall landscape of the entire . . . area," EA at 37, according to the EA, the measures—which seek to restore aspects of the "natural landscape" lost due to years of use, *id.* at 37-38—ultimately "will have a positive effect on the current conditions," *id.* at 39.

Plaintiff points to one mitigation measure it believes should have been implemented, but was not. It argues that it "continually objected to the Forest Service's failure to ensure that the gravel pit area would be restored to the same height and contours that existed before the mining." Pl.'s Resp. at 12. First, Plaintiff's assertion that the Forest Service has failed to guarantee restoration of the area's "contours" is misplaced. The mitigation measures *will* restore the natural contours of the land. *See* EA at 25 ("The first step in the final reclamation process would be to reestablish the contours utilizing the stockpiled overburden."). As for the height of the land, the record shows that the Forest Service attempted to implement mitigation measures that would have prevented the eight-foot elevation drop, but Elkhorn Minerals rejected them. *See* EA at 22 ("To date, the mineral owner has agreed to every negotiated mitigation measure with the exception of 1) replacing the removed materials with other materials and 2) dropping the proposal altogether."). Given Elkhorn Minerals' mineral rights and the Forest Service's limited authority to regulate the use of the surface, the court cannot find arbitrary and capricious the Forest Service's decision not to proceed with an EIS based on the drop in elevation. The Forest Service took the required hard look at the direct impacts on the viewshed and set forth mitigation measures that minimized the

Gravel Pit's impacts.  Plaintiff understandably would have preferred that any drop in the area's elevation be avoided.  But NEPA does "not mandate particular results"; it "simply prescribes the necessary process."  *Robertson*, 490 U.S. at 332.  The Forest Service has complied with that process here.

The cases on which Plaintiff relies do not compel a different conclusion.  In *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), the Ninth Circuit found that an agency violated NEPA where it "failed to address concerns raised by its own experts, [and other agencies]," *id. at* 492; "offered no reasoned analysis whatsoever in support of its conclusion . . . that there will be no environmental effect caused by [certain of its actions]," *id.*; "entirely failed to consider an important aspect of the problem," *id.* at 493 (citation and internal quotation marks omitted); and "failed to consider the combined and synergistic effects of the proposed [actions]," *id.*  Similarly, in *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F. Supp. 2d 1233 (D. Colo. 2009), the court found that the agency's issuance of a DN/FONSI was arbitrary and capricious because, among other "omissions," "significant mitigation measures . . . were not even developed, much less evaluated" and "it [was] unclear from th[e] record whether the agency really evaluated the efficacy of many of the proposed safeguards," *id.* at 1245-46.  None of the deficiencies present in *Western Watersheds* or *San Luis Valley* exist here.

In the third case Plaintiff cites, *Sierra Club v. Block*, 614 F. Supp. 134 (E.D. Tex. 1985), the court in fact concluded that the agency's NEPA analysis *was* adequate, finding that the agency "evaluated the environmental effects of the . . . program in good faith, objectively, and in detail, and . . . examined the alternatives sufficiently to permit a reasoned choice from among various options."  *Id.* at 137.  The same is true here.  Accordingly, Plaintiff has not offered any evidence

or authority that would support a finding that the Forest Service's analysis of the Gravel Pit's impacts on the viewshed was arbitrary and capricious.

c.   Impacts on golden eagles

Plaintiff also asserts that the Forest Service failed to take a hard look at the impacts of the Gravel Pit on golden eagles and neglected to implement enforceable mitigation measures to minimize any harm to the species.   In support of this argument, Plaintiff relies on the Forest Service's correspondence with the U.S. Fish and Wildlife Service and comments from a golden eagle expert, Anne Coyle.   Plaintiff argues that those sources apprised the Forest Service of the project's potential impacts on golden eagles and the Forest Service failed to adequately mitigate those impacts.   *See* Pl.'s Mot. at 21-24.   In response, the Forest Service argues that because "Plaintiff did not raise these complaints with the Forest Service in its pre-decisional objection . . . the arguments are waived," Defs.' Resp. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 49 [hereinafter Defs.' Resp.], at 14; however, "[i]f the Court finds that Plaintiff *can* bring this claim, Plaintiff fails to show any unmitigated significant impact to golden eagles requiring an EIS," *id.* at 15 (emphasis added).   The court need not address the Forest Service's argument regarding waiver as it finds the agency's second argument to be correct—Plaintiff has not shown that the Forest Service failed to sufficiently evaluate or mitigate the Gravel Pit's potential impacts on golden eagles.   Indeed, the record leaves no doubt that the Forest Service did so.

According to the EA, "[o]ne potential golden eagle nest is known within one-half mile of the proposed gravel pit site."   EA at 74.   Although "two eggs of an unknown species [were] found abandoned in" the nest in 2007, and a Canadian goose was observed in the nest in 2011, no golden eagle has been seen in the nest since 1985.   *Id.*; FS-002739.   Notwithstanding these facts, in April 2012, a Fish and Wildlife Service official raised concerns that the Gravel Pit "may 1) significantly

diminish the likelihood of future occupancy of the nest site by golden eagles under any plan of operations, or 2) lead to the likely failure of the nest if breeding golden eagles are actively nesting at the time the Project commences." FS-000975. The Fish and Wildlife Service official recommended that the "mining permit . . . stipulate the requirement that mining operations be prohibited during the next prospecting period (approximately January 1) and when the nest site and/or territory is occupied." *Id.* Two years earlier, in November 2010, Professor of Biology Anne Coyle had suggested that the Forest Service "prevent[] the extraction of gravel from th[e proposed Gravel Pit] site during the period of time February – aug./Sept." FS-002719.

The Forest Service's correspondence with the Fish and Wildlife Service and with Coyle, along with its responses to EA comments, make clear that the agency considered the recommendations regarding golden eagles and took a hard look at the Gravel Pit's potential impacts on the species. *See* FS-002739 (Forest Service official Arden Warm providing his analysis, to a colleague, on the Fish and Wildlife Service official's April 2012 letter); *see also* FS-000550 (the Forest Service's responses to comments about impacts on golden eagles). The Forest Service's consideration of the impacts on golden eagles spanned a five-year period, from 2010 until the release of the EA in 2015. *See* FS-002718-19 (November 8, 2010, email correspondence with Coyle); FS-002766-69 (April 15, 2015, correspondence regarding eagle monitoring activities that had occurred that morning). And the Forest Service undertook surveys in 2010, 2011, 2012, 2014, and 2015, to confirm the continued absence of golden eagles in the identified nest. *See* EA at 74; FS-002724; FS-002739; FS-002741; FS-002766-69.

Moreover, the mitigation measures put into place by the Forest Service to minimize the Gravel Pit's impacts on golden eagles resolve any doubt about the sincerity with which the Forest Service approached this environmental concern. After discussing potential impacts on golden

40

eagles, the EA explains that a "timing mitigation measure . . . included within the [Operating Plan] Stipulations . . . account[s] for the potential nesting period (Feb. 1 to July 31) [by] requiring a survey after April 15 to determine the nesting activity level of this nest and the surrounding area." EA at 75.  "If nesting activities occur," the EA continues, "construction activities would not occur between the dates of Feb. 1 and July 31."  *Id.*  The operating plan includes an additional protection, which the EA notes "is enforceable and would guarantee protection of the eagles until they left the nest," EA at 75:

> We would like to take a proactive approach to mitigate golden eagle activity in the nest that lies directly west of the material pit, by getting a proper survey completed around February when nests first become occupied.  If the eagles are using the nest, mining will halt until sometime in the summer when the fledging eagles have successfully left the nest.

FS-000014-15.  Collectively, the EA and the operating plan provide for surveys "around February" and "after April 15," which, if eagle nesting activity is observed, will result in the stoppage of mining operations to avoid adversely impacting the species.

Despite the Forest Service's consideration of relevant comments and the mitigation measures it imposed, Plaintiff claims that the agency's actions are arbitrary and capricious, arguing without explanation that none "of these 'mitigation measures' is enforceable."  Pl.'s Mot. at 23; *see also id.* ("[N]either the stipulations contained in the EA, nor any other record documents, include enforceable prohibitions on operations between Feb. 1 and July 31 when an eagle nest is found.").  As discussed above, the record belies that assertion.  To the extent that Plaintiff's complaints are rooted in the Forest Service's failure to implement every single recommendation of the Fish and Wildlife Service, the court notes that, "under the rule of reason, a lead agency does not have to follow [other agencies'] comments slavishly—it just has to take them seriously."  *CAB*, 938 F.2d at 201.  The Forest Service did so here.

>            d.      Precedential nature of the Forest Service's actions

Plaintiff next claims that the Forest Service's failure to conduct an EIS for the Gravel Pit

is arbitrary and capricious because of the precedent-setting nature of that action.  CEQ regulations

provide that the question whether a proposed action will "significantly affect the quality of the

human environment" "requires considerations of both context and intensity."  40 C.F.R.  §§

1501.4(b), 1508.27.  The regulations identify "significance factors" that "should be considered in

evaluating intensity."  *Id.* § 1508.37(b).  Among those significance factors is the "degree to which

the action may establish a precedent for future actions with significant effects or represents a

decision in principle about a future consideration."  *Id.*

Relying on *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985), and *Friends of the Earth

v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30 (D.D.C. 2000), Plaintiff argues that "the

precedent set by approving the Elkhorn Gravel Pit will put more pressure on the Forest Service to

approve more gravel mining operations on the historic Elkhorn Ranchlands" and is particularly

significant in light of the "Forest Service[']s state[ments] that there is a 'high probability' that

more plans of operations for gravel mines will be submitted for mining 'within the same vicinity.'"

Pl.'s Mot at 25 (quoting EA at 33).  The Forest Service disputes that its approval of the Gravel Pit

is precedential and contends that *Marsh* and *Friends of the Earth* are inapposite.  Defs.' Mot. at

16-17.  The court agrees with the Forest Service.

In *Marsh*, the First Circuit analyzed a decision by several agencies to issue a DN/FONSI

rather than prepare an EIS for a cargo port and causeway proposed to be built on Sears Island, "an

undeveloped, wooded 940-acre island."  769 F.2d at 872.  In discussing the agencies' "failure to

consider adequately the fact that building a port and causeway may lead to the further industrial

development of" the island, *id.* at 877, the First Circuit found that "the record makes it nearly

impossible to doubt that building the causeway and port will lead to further development of Sears Island," *id.* at 878.  The court deemed notable the fact that "[l]ocal planners have considered the port, causeway, and industrial park to be components of an integrated plan." *Id.* at 878.  Indeed, the record "contain[ed] . . . a 35-page 'Land Use Plan/Industrial Marketing Study' prepared for the owner of the southern half of the island, and [a] 50-page 'Municipal Response Plan for the Industrial Development of Sears Island,'" that together "provide[d] detailed descriptions of likely further development." *Id.* at 879.  Based on the near certainty of development that would follow— and presumably only follow—the construction of the port and causeway, the First Circuit determined that the action was precedential, as contemplated by the CEQ regulations. *Id.* ("[O]nce Maine completes the causeway and port, pressure to develop the rest of the island could well prove irreversible.").  In *Friends of the Earth*, additional development that was expected to follow the agency action at issue—the permitting of three casinos on the Mississippi coast—also was reasonably certain.  There, "twenty casinos ha[d] [already] been permitted along the Mississippi coast."  109 F. Supp. 2d at 41.  The court found the agency action to be precedential because, "[w]ith the proliferation of casinos along the Mississippi coast, the Corps may feel bound to the conclusions reached in the FONSIs issued in these cases, thereby allowing the FONSIs to serve as precedent for future casino projects." *Id.* at 43.

The absence of any certain, or near certain, plans for future development, *see supra* Part IV.A.2.a.ii, distinguishes this case from *Marsh* and *Friends of the Earth*.  Nothing in the record supports a conclusion that the Forest Service's issuance of a DN/FONSI for the Gravel Pit will create "irreversible" pressure to approve a future project without completing an EIS or will cause the Forest Service to "feel bound" by their decision not to produce one here.  Under current case law, the court does not find that the Forest Service's "action may establish a precedent for future

43

actions" and thus disagrees with Plaintiff that the agency's issuance of a DN/FONSI for the Gravel Pit was arbitrary and capricious.

Moreover, another critical fact distinguishes this case from *Marsh* and *Friends of the Earth*. This case involves a "precedential" decision far more significant than the agency's approval of the Gravel Pit—namely, Congress' decision to acquire the Elkhorn Ranchlands pursuant to existing and outstanding mineral rights and to guarantee expressly the land's continued "multiple uses." That decision set the definitive precedent that governs usage of the Elkhorn Ranchlands, a precedent that the Forest Service is required to implement, subject to its limited legal authority to place reasonable restrictions on rights holders' use and enjoyment of the surface. Thus, to the extent that future mineral development may occur within the Elkhorn Ranchlands, it will be the result of Congress' decision, not the decision by the Forest Service at issue here.

e.    Highly controversial nature of the Forest Service's actions

Plaintiff asserts that a second significance factor required the Forest Service to produce an EIS for the Gravel Pit—"[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). As evidence of controversy, Plaintiff points to statements by officials of the National Park Service, including "a June 2014 letter . . . [that] reiterated the importance of the Elkhorn Ranchlands to . . . Theodore Roosevelt National Park . . . and repeat[ed] the [National Park Service's] request that a full EIS be prepared." Pl.'s Mot. at 26 (citing FS-003247). Plaintiff also relies on statements by Theodore Roosevelt National Park Supervisor Wendy Ross, who said "that the gravel pit would 'fundamentally alter the visitor experience and the environment in the Elkhorn Ranch Unit of [the] Park and the Greater Elkhorn Ranchlands,'" and that, although "mitigation measures may reduce some impacts, . . . they do not minimize the impacts to the extent that a . . . determination of 'No adverse impact' can

44

be reached.'"  *Id.*  The National Park Services' statements, Plaintiff argues, "together with the overwhelming percentage of comments opposing the gravel pit . . . clearly show that there was a 'substantial dispute . . . as to the size, nature or effect' of the pit."  *Id.* (quoting *Town of Cave Creek*, 325 F.3d at 331).  The Forest Service counters that it "considered and responded to the [National Park Service's] comments, but simply disagreed with [its] approach."  Defs.' Mot. at 18. "That disagreement," the Forest Service continues, "does not constitute a violation of NEPA, nor does it create a 'highly controversial' project."  Defs.' Resp. at 17.  The court concurs.

The Court of Appeals has stated that "controversial," as used in the CEQ regulations, "'refers to cases where a substantial dispute exists as to the size, nature, or *effect* of the major federal action rather than to the existence of opposition to a use.'"  *Town of Cave Creek*, 325 F.3d at 331 (quoting *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)).  Nonetheless, "[j]ust what constitutes the type of 'controversy' that requires a full EIS is not entirely clear," *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 184 (D.D.C. 2004), although "certainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter," *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975).

Many courts have found "something more" to be scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions.  For example, in *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722 (9th Cir. 2001), a Ninth Circuit case relied upon by the Court of Appeals in *Town of Cave Creek*, the court found the agency action at issue to be highly controversial where comments "cast substantial doubt on the adequacy of the Parks Service's methodology and data."  *Id.* at 736.  The court wrote:

> The dispute . . . goes beyond a disagreement of qualified experts over the "reasoned conclusions" as to what the data reveal.  Here, the agency's conclusions were not

> reached by reasoned extrapolation from the data, rather the data were simply insufficient. . . . The data . . . did not establish the intensity of that impact, nor the efficacy of the mitigation measures designed to offset that unquantified impact. NPCA asserted that the effects on the environment would likely be substantial. The Parks Service responded that the extent of the effects was unknown. Therein lay the controversy.

*Id.* at 736-37; *see also Nat'l Wildlife Fed'n*, 332 F. Supp. 2d at 185 ("Such a controversy exists where the Corps is presented with scientific evidence specifically evaluating the environmental effects of the proposed project or calling into question the adequacy of the EA."); *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003) ("While plaintiffs have identified serious gaps in defendants' assessment of the local effects of the proposed action, they do not appear to have identified any scientific controversy *per se* as to the extent of the effects . . . . Therefore, the Court is not persuaded that plaintiffs have made a 'substantial case' as to the existence of this factor.").  These cases teach that even the submission of declarations "from numerous experts who claim[] that [a project] will have significant adverse impacts on [an area] . . . alone fail[s] to rise to the level of 'controversy' under NEPA."  *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58, 67-68 (D.D.C. 2010) *aff'd in part, rev'd in part on other grounds*, 661 F.3d 1147 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012); *but cf. Humane Soc'y*, 432 F. Supp. 2d at 19-20 (finding agencies' decision not to prepare an EIS to be highly controversial based on comments from the plaintiff and other agencies indicating their disagreement with the agencies' conclusions).

Here, Plaintiff has not identified any scientific criticism of the methods or data relied upon by the Forest Service.  Rather, the disagreement concerns the conclusions that should be drawn from those methods and data—"a full EIS [should] be prepared"; "the gravel pit would fundamentally alter the visitor experience and the environment"; "mitigation measures . . . do not minimize the impacts to the extent" necessary.  The National Park Service did not challenge, for example, the methods the Forest Service used to determine that the baseline noise in the area of

the Gravel Pit is 50 decibels.  It did not take issue with the integrity of the surveys the Forest Service conducted to determine whether golden eagles have used a nearby nest.  And while disagreement between a lead and cooperating agency is notable, it does not compel the production of an EIS.  *See CAB*, 938 F.2d at 201 ("[T]he FAA, not the EPA, bore the ultimate statutory responsibility for actually preparing the environmental impact statement, and under the rule of reason, a lead agency does not have to follow the EPA's comments slavishly—it just has to take them seriously.  The FAA considered the EPA's criticisms in this case and decided that enough had been done.") (citation omitted)).  The court thus does not find the Forest Service's approval of the Gravel Pit project and issuance of the DN/FONSI to be "highly controversial" so as to compel the production of an EIS.

### B.      The Forest Service's Compliance with the NFMA

Plaintiff's final argument is that the Forest Service violated the National Forest Management Act, or the NFMA, "by fail[ing] to update and amend the [Grasslands] Plan following acquisition of 5,200 acres of the historic Elkhorn Ranchlands."  Pl.'s Mot. at 29.  Plaintiff contends that "[i]f the Forest Service had amended the [Grasslands] Plan, that would have provided the agency with a roadmap of thoroughly vetted management standards to guide the agency in determining appropriate mitigation measures for the proposed Elkhorn Gravel Pit."  *Id.*  It asserts that "the amended [Grasslands] Plan could have provided an overall approach for guiding development in the Elkhorn Ranchlands, instead of leaving the Forest Service to review the Elkhorn Gravel Pit in isolation without a conservation framework to delineate acceptable impacts, mitigation measures and alternatives."  *Id.*  Even if Plaintiff's speculative statements were to prove true—and, as discussed, the record indicates that they would not, *see supra* Part IV.A.1.b.iv—the Forest Service's failure to amend the Grasslands Plan did not violate the NFMA.

47

The Grasslands Plan was last revised in 2002.  *See* FS-004976-5294.  Under the NFMA, land and resource management plans must be "revised . . . from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years."  16 U.S.C. § 1604(f)(5)(A).  On repeated occasions since 2001, however, Congress has extended the 15-year period, stating, for example, that "the Secretary of Agriculture shall not be considered to be in violation of . . . 16 U.S.C. 1604(f)(5)(A) . . . solely because more than 15 years have passed without revision of the plan for a unit of the National Forest System."  Pub. L. No. 111-8, § 410, 123 Stat. 524, 746 (2009).  "[B]y enacting repeated extensions," the Court of Appeals has stated, "Congress has necessarily concluded that some delays in revising [land and resource management] plans are justified."  *Montanans For Multiple Use*, 568 F.3d at 228 (concluding that although "Plaintiffs may be frustrated with the seven congressional extensions of the 2001 deadline for a new Flathead Forest Plan," and the 23 years that had passed since the last update of that Plan, "their frustration is the result of explicit action by multiple Congresses and two Presidents—and cannot be redressed by the Judiciary in this Administrative Procedure Act lawsuit").

Here, 15 years have yet to pass since the Grasslands Plan was updated, so, even absent congressional extensions, the Forest Service has not run afoul of the statutory period.  Further, Plaintiff has identified no regulation or case law—and the court is aware of none—that would support a finding that the purchase of the Elkhorn Ranchlands caused "conditions in [the Dakota Prairie Grasslands to] significantly change[]" sufficient to render the Forest Service's failure to update the Grasslands Plan arbitrary and capricious.  Such a conclusion would be dubious in light of the substantial deference afforded to the Secretary of Agriculture and the Forest Service; the Forest Service's "commencement [of] work on an amendment to the Grasslands Plan to adopt specific management area direction for the 5,200 acres of the Elkhorn Ranchlands acquisition,

[which it] has not yet completed," Defs.' Opp'n to PI at 30 (citing FS-005505-67); the fact that the

Elkhorn Ranchlands makes up approximately .004 percent of the Dakota Prairie Grassland 1.26

million acres, *see* FS-004976; and the Court of Appeals' statement that "Congress has necessarily

concluded that some delays in revising [land and resource management] plans are justified,"

*Montanans For Multiple Use*, 568 F.3d at 228.  The Forest Service thus has not violated the NFMA

here.

## V.   CONCLUSION

For the foregoing reasons, the court grants Defendants' and Intervenor's Motions for

Summary Judgment in their entirety, and denies Plaintiff's Motion for Summary Judgment in its

entirety.[10]  A separate Order accompanies this Memorandum Opinion.

---

[10] Even if the court were to have found any of the Forest Service's actions to be arbitrary and capricious, the court harbors doubts that it could have granted the relief that Plaintiff seeks—a remand to the agency in order to amend the EA; issue an EIS; or update the Grasslands Plan and then amend the EA or issue an EIS.  In a footnote in *Duncan Energy*, the Eighth Circuit stated the following:

> Implicit in our conclusion that the Forest Service is authorized to determine the reasonable use of the federal surface is our assumption that the Forest Service's inquiry must be reasonable, and thus, expeditious.  Otherwise, the Forest Service's authority could expand to "veto authority" over mineral development. . . .  Counsel at oral argument represented that the Forest Service approval of a surface use plan usually takes about two months. We believe such a timeframe is consistent with the Forest Service's authority to determine the reasonable use of the federal surface and does not violate the mineral holder's dominant right to access and develop its mineral estate.

50 F.3d at 591 n.8.  In a subsequent appeal, the Eighth Circuit clarified that the two-month time period it referenced in its footnote was not a rigid requirement.  *Duncan Energy Co. v. U.S. Forest Serv.*, 109 F.3d 497, 499 (8th Cir. 1997).  "Reasonableness of processing time," the court held, "must be determined on the basis of the totality of circumstances related to each surface use plan and the obligations of the Forest Service."  *Id.* at 500.  Nevertheless, the court reiterated that the Forest Service's "processing time must be reasonable, expeditious, and as brief as possible."  *Id.*

Here, the Forest Service's approval process began more than six years ago.  *See* EA at 4.  At this point, it would be near impossible to square a requirement that the Forest Service's exercise of its limited authority be done expeditiously with an order from this court directing the Forest Service to engage in further evaluation or produce additional documentation.  This is particularly true with regard to the production of an EIS, which Plaintiff's counsel has represented "could be done in about a year, maybe a year to two years," while conceding "that there are [EISs] that have dragged on for a long time."  Mot. Hr'g Tr., Jan. 8, 2016, ECF No. 41, at 13:15-22.  Absent the ability to compel additional action by the Forest Service, the court's ordering of a remand here would be futile.  *See Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 272 (D.D.C. 2014) *appeal dismissed sub nom. Conservation Law Found. v. Nat'l Oceanic & Atmospheric Admin.*, No. 14-cv-5135, 2014 WL 4627848 (D.C. Cir. July 24, 2014) ("When an agency commits a legal error, a court 'normally remand[s] . . . to the agency.'  The one exception is where 'remand would be futile.'") (quoting *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C. Cir. 2001)); *see also Pub. Citizen*, 541 U.S. at

Dated:  March 31, 2016

Amit P. Mehta
United States District Judge

---

767 ("Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS.").  Given the foregoing, the court has, at best, misgivings that it could grant Plaintiff the relief it seeks.